Mark G. **ABBEY, et al., Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

No. 07–272 C.

United States Court of Federal Claims.

June 12, 2012.

Gregory K. McGillivary, Washington, DC, for plaintiffs. Sara L. Faulman, Washington, DC, of counsel.

Hillary A. Stern, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Todd M. Hughes, Deputy Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant. Brett Daee, Attorney, Office of Chief Counsel, Federal Aviation Administration, Washington, DC, of counsel.

## OPINION [1]

HEWITT, Chief Judge.

This is an action brought by Mark G. Abbey, et al. (plaintiffs) to recover overtime pay as provided for by the Fair Labor Standards Act (the FLSA), 29 U.S.C. §§ 201–19 (2006).

Before the court are Plaintiffs' Memorandum of Contentions of Fact and Law (Pls.' Mem.), Docket Number (Dkt. No.) 210, filed January 6, 2012; Defendant's Memorandum of Contentions of Fact and Law (Def.'s Mem.), Dkt. No. 232, filed February 6, 2012; Defendant's Post–Trial Brief (Def.'s Br.), Dkt. No. 268, filed April 20, 2012; Plaintiffs' Post Trial Brief (Pls.' Br.), Dkt. No. 269, filed April 20, 2012; Plaintiffs' Post Trial Reply Brief (Pls.' Reply), Dkt. No. 270, filed May 4, 2012; and Defendant's Reply to Plaintiff[s'] Post–Trial Brief (Def.'s Reply), Dkt. No. 271, filed May 4, 2012.

## I. Background

### A. Procedural Background

Plaintiffs are traffic management coordinators and air traffic control specialists, currently or formerly employed by the Federal Aviation Administration (FAA, defendant or the Agency). *Abbey v. United States (Abbey II )*, 99 Fed.Cl. 430, 434 (2011). Plaintiffs

brought four claims alleging violations of the FLSA. *Id.* In Count I, plaintiffs claimed that defendant failed properly to compute their rate of overtime pay by excluding Organizational Success Increase, Retention Incentive, Superior Contribution Increase, Controller Incentive Pay, and Sunday premium pay payments from the computation of plaintiffs' regular rate of pay. *Id.* at 439. In Count II, plaintiffs claimed that defendant violated the FLSA by compensating plaintiffs with compensatory time or credit hours instead of paying them overtime compensation as required by the FLSA. *Id.* at 435. In Count III, plaintiffs claimed that defendant failed to compensate them for pre- and post-shift activities. *Id.* In Count IV, plaintiffs contended that defendant failed to compensate them for off-duty time they spent bidding on work schedules and leave. *Id.*

In *Abbey v. United States (Abbey I )*, 82 Fed.Cl. 722 (2008), the court granted summary judgment to plaintiffs on Count II of the Complaint "[b]ecause defendant's payment of hour-for-hour compensatory time and credit hours violates the FLSA requirement that overtime compensation be paid at 'one and one-half times' the employee's regular rate of pay," *id.* at 745 (quoting 29 U.S.C. § 207(a)(1)). In *Abbey II,* the court granted partial summary judgment to plaintiffs on Count I of the Complaint, concluding that Organizational Success Increase, Retention Incentive and Superior Contribution Increase payments must be included in computing the regular rate of pay. *Abbey II,* 99 Fed.Cl. at 449–50, 452–54, 461. The court also granted summary judgment to defendant in *Abbey II* with respect to Count IV of the Complaint, concluding that the time that controllers spend bidding on work schedules and vacation leave while off-duty did not constitute "work" under the FLSA. *Id.* at 458–61. The court held that genuine issues of material fact prevented the resolution of Count III on summary judgment because it was unclear from the record whether plaintiffs spent more than a de minimis amount of time on

---

1. For convenient reference, the court attaches at the end of this Opinion a Table of Contents

(Appendix A).

uncompensated pre- and post-shift activities.[2] *Id.* at 458. The parties have agreed to pursue settlement of Count III, *see* Joint Mot. for Leave to File Status Report, Dkt. No. 208, at 1, and of Count I, *see* Order of Mar. 1, 2012, Dkt. No. 251, at 1.

The only remaining issues for the court to determine are with respect to damages for Count II, in particular:

(1) How the back pay owed to plaintiffs should be calculated and what is the quantum of damages with respect to each individual plaintiff;

2. Defendant moved for certification of an interlocutory appeal, and both parties subsequently moved for certification pursuant to Rule 54(b) of the Rules of the United States Court of Federal Claims (RCFC). *See* Def.'s Mot. to Certify for Interlocutory Appeal, Docket Number (Dkt. No.) 102; Parties' Joint Mot. for RCFC 54(b) Certification of Certain Pls.' Claims, Dkt. No. 195. Defendant's Motion to Certify for Interlocutory Appeal was denied on October 14, 2009, *see Abbey v. United States*, 89 Fed.Cl. 425, 432 (2009), and the Parties' Joint Motion for RCFC 54(b) Certification of Certain Plaintiffs' Claims was denied on October 27, 2011, *see Abbey v. United States*, 101 Fed.Cl. 239, 242–45 (2011).

3. For convenient reference, the names, in alphabetical order, and a description of each of the witnesses upon whose live testimony the court relies in this Opinion follows:

Ms. Sherri Jensen is a fact witness called by defendant. Ms. Jensen is a management and program analyst for the HR Information Systems office of the Federal Aviation Administration (FAA). Tr. 488:10–15, 489:4–11 (Jensen). She has worked for the FAA since 1988, serving as a payroll technician in Payroll Operations, a payroll systems specialist in the Payroll Systems Office, and in the offices of HR Operations and HR Information Systems. *Id.* at 488:24–489:5.

Mr. Barry Krasner is a fact witness called by plaintiffs. Mr. Krasner is the executive director of the National Air Traffic Controllers Association (NATCA). Tr. 147:18–23 (Krasner). In 1998, while serving as an air traffic controller at the New York Terminal Radar Approach Control (TRACON), Mr. Krasner was chief negotiator for the NATCA union for contract negotiations. *Id.* at 148:1–12. Mr. Krasner was also a member of the contract team for the 2006 collective bargaining agreement negotiations. *Id.* at 151:11–18.

Dr. Louis R. Lanier is an expert witness called by plaintiffs. Dr. Lanier has a Ph.D. in Applied Economics from Clemson University. Tr. 226:10–15 (Lanier). Dr. Lanier has been employed at the economic consulting firm Econ One Research Incorporated since January 1, 2008. *Id.* at 225:19–22. Dr. Lanier has previously testified in approximately fifteen to twenty labor cases by

(2) Whether defendant's violation of the FLSA was willful such that plaintiffs are entitled to a third year of damages; and

(3) Whether defendant acted in good faith even if it violated the FLSA such that plaintiffs are not entitled to liquidated damages.

*See* Order of Feb. 23, 2012, Dkt. No. 242, at 3.

The court held a trial of damages from March 5–7, 2012 in Washington, DC at the Howard T. Markey National Courts Building.[3] Factual findings from the trial upon

deposition or at trial. *Id.* at 226:19–227:1; *see also* Pls.' Ex. (PX) 6 (Lanier Report) App. A. The court qualified Dr. Lanier as an expert in "[t]aking raw pay data and performing back-pay calculations based on instructions from counsel." Tr. 230:24–231:6 (the court).

Mr. Andrew LeBovidge is a fact witness called by plaintiffs. Mr. LeBovidge has been an air traffic control specialist with the FAA at the Houston Air Group Traffic Control Center for twenty years. Tr. 173:17–174:7 (LeBovidge).

Mr. Michael Masson is a fact witness called by both plaintiffs and defendant. Mr. Masson is an air traffic control specialist, serving as a support specialist for the headquarters unit with the FAA. Tr. 125:10–12 (Masson). Mr. Masson began working at the FAA in 1982. *Id.* at 298:13–14. He served as an air traffic control specialist at the Lake Charles, Louisiana air traffic control tower and the New Orleans International Tower and TRACON in New Orleans, Moissant Field. *Id.* at 298:15–17, 299:20–24. He has also served as an automation specialist ("in the automation that runs on the radar scope to track the targets"), *id.* at 300:8–11; a facility manager at both Houma, Louisiana and Lakefront Tower in New Orleans, *id.* at 300:18–25, 301:9–11, and "worked in the IT department in the headquarters office for the air traffic organization" in Washington, DC, *id.* at 301:18–23. Mr. Masson has experience supervising payroll systems, *id.* at 301:24–302:3, and has also served as a time-and-attendance clerk, *id.* at 298:23–25.

Mr. Lawrence Markel is a fact witness called by plaintiffs. Mr. Markel was employed as an air traffic controller specialist by the FAA for twenty-three years before his retirement two years ago. Tr. 206:9–21 (Markel). Mr. Markel worked at several facilities during his employment by the FAA, including Jacksonville International Airport, Craig Municipal Airport, Standiford Approach Control in Louisville, Kentucky, and West Palm Beach Approach Control. *Id.* at 206:19–207:6.

Mr. Larry Staley is a fact witness called by plaintiffs and serves both as defendant's Rule 30(b)(6) designee under the RCFC and as defendant's designated representative under Federal

which the court will rely in rendering its decision follow. Particularly relevant to the issues of willfulness and good faith was testimony related to the development of the FAA's personnel management system.

In 1995, Congress directed the FAA to develop a new personnel management system, while simultaneously directing that the provisions of Title 5—which provides that, in some cases, a government employer may provide compensatory hours to employees as an alternative to cash overtime compensation, *see Abbey I,* 82 Fed.Cl. at 730–31— would no longer apply to the FAA, *see infra* Part I.B.1. In developing its personnel management system, the FAA interpreted the language of Congress's directive to mean that the FAA could choose which provisions of Title 5 would continue to apply to the FAA. *See infra* Part I.B.1. This interpretation resulted in a decision to maintain the FAA's practice of awarding compensatory time and credit hours to employees in lieu of the cash overtime compensation required by the FLSA. *See infra* Part I.B.1. Also relevant was testimony concerning the FAA's policies and practices with respect to the accrual, use and expiration of compensatory time and credit hours.

### B. Factual Findings [4]

1. Development of the FAA's Personnel Management System (PMS)

In 1995, Congress passed the Department of Transportation and Related Agencies Ap-propriations Act of 1996 (Appropriations Act), Pub.L. No. 104–50, 109 Stat. 436 (1995). In section 347 of the Appropriations Act, Congress directed the Administrator of the FAA "[i]n consultation with the employees of the [FAA] and such non-governmental experts in personnel management systems as he may employ" to "develop and implement ... a personnel management system for the [FAA] that addresses the unique demands on the agency's workforce. Such a new system shall, at a minimum, provide for greater flexibility in the hiring, training, compensation, and location of personnel." Appropriations Act § 347(a). The Appropriations Act also directed that "[t]he provisions of title 5, United States Code, shall not apply to the new personnel management system developed and implemented pursuant to subsection (a)," subject to several enumerated exceptions. *Id.* § 347(b).

In response to the directive in the Appropriations Act to develop a PMS, the director of personnel for the FAA convened a large meeting of FAA human resources personnel, a representative from the FAA's counsel's office, and employees from the Department of Transportation. *See* Tr. 426:2–25 (Whitlow). The administrator subsequently created the Personnel Reform Advisory Board (PRAB), an oversight body for six working groups that was made up of union leaders and higher-level FAA officials. *Id.* at 431:8–

Rule of Evidence 615(b). *See* Order of Feb. 23, 2012, Dkt. No. 242, at 2. Mr. Staley is a human resources specialist with the FAA's Policy Management Division under the assistant administrator for human resource management. Tr. 537:4–11, 21–25 (Staley). Mr. Staley has worked for the FAA since October 2005 and has been responsible for FAA policy with respect to compliance with the Fair Labor Standards Act (FLSA) since approximately August 2008. *Id.* at 49:4–14.

Ms. Paula Thomas is a fact witness called by defendant. Ms. Thomas is a controlled correspondence specialist with the FAA and, as part of her duties, logs, assigns and tracks correspondence that is assigned to the chief counsel's office. Tr. 285:19–24, 286:11–13 (Thomas).

Mr. James Whitlow is a fact witness called by both plaintiffs and defendant. Mr. Whitlow worked for the FAA for thirty-three years before retiring on January 1, 2011. Tr. 85:7–16 (Whitlow). In 1996, as the assistant chief counsel for the General Legal Services Division, *id.* at 85:23–86:1, Mr. Whitlow was the primary legal resource for the FAA with respect to personnel reform, *id.* at 87:2–19. Mr. Whitlow crafted a first draft of the FAA's personnel management system document in response to section 347 of the Department of Transportation and Related Agencies Appropriations Act of 1996. *See id.* at 424:17–425:2, 435:13–16. A revised version of that document subsequently became effective when signed by the FAA administrator. *See id.* at 457:23–25.

4. The court's factual findings are based only upon the testimony and evidence admitted at trial relevant to the determination of damages. Facts relevant to the court's determinations on liability can be found in two of the court's previous opinions in this case: *Abbey v. United States (Abbey I ),* 82 Fed.Cl. 722, 724–25 (2008) and *Abbey v. United States (Abbey II ),* 99 Fed.Cl. 430, 434–35 (2011).

16. After one of the regular PRAB meetings, Mr. James Whitlow, then assistant chief counsel for General Legal Services at the FAA, *id.* at 428:2–8, determined that a draft document was needed "of what ... the Administrator could sign that would comply with the statute and constitute implementation of the new personnel system," *id.* at 435:7–20, and that "the teams could use to work from and the PRAB could use to work from," *id.* at 436:14–19, and undertook to draft such a document (the PMS Document), *see id.* at 436:10–12.

Mr. Whitlow testified that, as part of drafting the PMS Document, "over a weekend" he "s[a]t down with Title 5" and went through it. *Id.* at 437:2–3. He determined that some portions of Title 5 "included some language that we needed to have [i]n our personnel system ... that if we didn't repeat we would have no statutory authority, no authority to spend appropriated funds on," for instance, the Back Pay Act. *Id.* at 437:3–10. He also "look[ed] at [s]ection 347, and c[a]me to a legal conclusion" about what it allowed the FAA to do with respect to Title 5. *See id.* at 438:8–10. Based on his view of the history of personnel and acquisition reform (in particular, his view that Congress was focused on providing the FAA with more flexibility in its personnel policies) and his view that the language of section 347, which excluded the FAA from Title 5, "just wouldn't make sense" if interpreted too literally, *id.* at 438:10–25, Mr. Whitlow concluded that the FAA was permitted to incorporate certain provisions of Title 5 into the FAA's PMS, *id.* at 438:25–439:7.

Mr. Whitlow testified that he had determined that:

> [W]e were not required to be covered by Title [5], but there were a number of provisions of Title [5] that we were allowed and had the authority to either incorporate by reference, repeat the provisions of, or continue those conditions in our new personnel system.
> What [section] 347 made clear was that [Title 5] wasn't mandatory, shall not apply, but there was no way that we could have interpreted that as meaning we were prohibited from continuing practices, things

that were incorporated in [contracts], things that made sense to do, and things for which we would not have had any other authority to spend appropriate[d] funds if we had interpreted that section 347 to mean we were prohibited from applying things that made sense in Title [5][ ] to our new personnel system.

*Id.* at 89:23–90:13. At no point did Mr. Whitlow or anyone else from the FAA undertake a written legal analysis of how Title 5, the FLSA, and section 347 of the Appropriations Act interacted. *See id.* at 96:19–23, 440:12–14. Nor did Mr. Whitlow consult with the United States Department of Labor (DOL) or the Office of Personnel Management (OPM) in determining whether the FAA could continue to provide compensatory time or credit hours after the enactment of section 347 of the Appropriations Act. *See id.* at 103:22–104:12. Instead, the PMS Document drafted by Mr. Whitlow contains a list of "initiatives and concepts" to be addressed in the future by the associate administrator for administration, which includes "use of compensatory time rather than overtime." Def.'s Ex. (DX) 2 (PMS Document) 2.48–2.49; Tr. 107:21–109:8 (Whitlow). When asked whether he knew if anything was ever done to consider further the use of compensatory time in lieu of overtime, as suggested by the list of concepts for future consideration, Mr. Whitlow responded that he was "not sure if it ever was." Tr. 109:9–23 (Whitlow).

Mr. Whitlow's determination that portions of Title 5 would continue to apply to the FAA was reflected in the final PMS Document, which states that "[s]ection 347(b) does not wholly exempt [the] FAA from all of Title 5," that the "FAA's new [PMS] is covered by the non-personnel management provisions of Title 5 that specifically apply to the [s]ecretary," and that "[a]lthough [s]ection 347(b) exempts the new personnel system from substantially all of Title 5, [the] FAA has discretion to adopt the substance of any portion of Title 5 as deemed appropriate." *See* DX 2 (PMS Document) 2.30–2.31. The final PMS Document contains enumerated lists of the provisions that the FAA believed would con-

tinue to apply.[5] *Id.*

Neither section 5543 (relating to the provision of compensatory time instead of payment for overtime hours worked) nor any other provision dealing with compensatory time or credit hours was specifically mentioned in the PMS Document. *Id. passim;* Tr. 105:18–106:17, 106:24–107:5 (Whitlow). Mr. Whitlow testified, however, that he did not intend for the list of Title 5 provisions that would continue to apply to the FAA to be exclusive. Tr. 464:16–19 (Whitlow).

The PMS Document also contained a savings provision that stated, "Except as provided below, from April 1, 1996 until September 30, 1997, the personnel compensation and benefits of all FAA employees shall continue to be determined in accordance with the standards and procedures that were in effect on March 31, 1996." DX 2 (PMS Document) 2.48; *see also* Tr. 465:14–24 (Whitlow). The PMS Document would make certain changes to the personnel system, but whatever it did not change would simply remain in effect in accordance with the FAA's previous practice. *See* Tr. 465:14–24 (Whitlow). Specifically with respect to flexible and compressed work schedules, the PMS Document provided that "FAA employees shall continue to be eligible to work flexible and compressed work schedules under the same criteria, procedures, and limitations that were applicable on March 31, 1996." DX 2 (PMS Document) 2.47; *see also* Tr. 466:2–15 (Whitlow).

The PMS Document drafted by Mr. Whitlow was circulated to the PRAB and the six sub-groups for feedback and some suggested changes were incorporated into the document. Tr. 446:20–449:7, 452:8–9, 453:19–22 (Whitlow). Then a review meeting of about fifty people was convened where the participants went through the PMS Document together, page-by-page, and where interested participants could raise objections or ask for clarification of issues. *Id.* at 454:2–455:12. After the meeting, the FAA administrator signed the document. *Id.* at 457:13–25. After the document was signed and within a few weeks after the April 1, 1996 deadline for implementation of the new PMS, FAA officials conducted a briefing on Capitol Hill. *Id.* at 458:1–460:19.

In October 1996 Congress passed the Federal Aviation Reauthorization Act of 1996 (Reauthorization Act), Pub.L. No. 104–264, 110 Stat. 3213 (1996). The Reauthorization Act recognized the FAA's implementation of the PMS effective on April 1, 1996. Reauthorization Act § 253; *see* Tr. 460:20–463:9 (Whitlow).

At no point in the process of development, consultation, or approval of the PMS Document did anyone question or challenge Mr. Whitlow's conclusion regarding the FAA's authority to adopt certain provisions of Title 5, even those not specifically enumerated in section 347. Tr. 452:24–453:13, 457:4–12, 459:23–460:19 (Whitlow).

2. Accrual and Use of Credit Hours and Compensatory Time

a. Credit Hours

"Credit hours are hours an employee may voluntarily elect to work as part of a flexible work schedule. They[] ... allow [employees] to work additional hours at one time and then take that time off later on." Tr. 554:5–9 (Staley). As stated in the 2003 Collective Bargaining Agreement (CBA) between the National Air Traffic Controllers Association (NATCA or the union) and the FAA, " 'Credit hours' are non-overtime hours worked under an [alternative work schedule] which are in excess of an employee's basic work requirement and which are worked at the elec-

5. The enumerated provisions of Title 5 include: § 2302(b) (whistleblower protection); §§ 3308–3320 (veterans' preference); § 7116(b)(7) (limitations on the right to strike); § 7204 (antidiscrimination); Chapter 73 (suitability, security and conduct); Chapter 81 (compensation for work injury); Chapters 83–85, 87, and 89 (retirement, unemployment compensation and insurance coverage); Chapter 3 (powers); Chapter 5 (administrative procedure); Chapter 15 (political activity of state and local employees); Chapter 91 (access to criminal history records); § 3307 (maximum entry age); § 5501 (disposition of lapsed salaries); § 5502 (unauthorized office); § 5503 (recess appointments); §§ 5511–20 (withholding pay); §§ 5533–37 (dual pay); §§ 5561–70 (payments to missing employees); Chapter 79 (services to employees); §§ 2901–06 (commissions, oaths); § 3111 (acceptance of volunteer services); §§ 3331–33 (oath of office); and §§ 5351–56 (student employees). Def.'s Ex. (DX) 2 (PMS Document) 2.30–2.31.

tion of the employee after approval by the Agency." Joint Ex. (JX) 1 (2003 CBA) 67; *see also* Tr. 127:21–128:2 (Masson).

In order to earn a credit hour, an employee requested permission from a supervisor to work additional hours. Tr. 555:4–25 (Staley). If the request was approved, the employee would work the hour, and then that hour would be placed in the employee's bank of credit hours, which was tracked on the FAA's timekeeping system (called CRU–X). *See id.* at 557:8–9; Tr. 392:10–394:9 (Masson); Tr. 510:23–511:3 (Jensen). When the employee wished to use a banked hour, the employee would make a request to his supervisor in the same manner as he would make a request to use annual leave. *See* Tr. 555:17–25, 557:5–10 (Staley). Regardless of when the employee earned the credit hour, and regardless of what hourly rate the employee was paid at the time the credit hour was earned, if an employee wished to use a credit hour, the employee was charged hour-for-hour from his credit hour bank. *Id.* at 56:9–60:8; Tr. 131:2–18 (Masson). The FAA did not have a policy with respect to which credit hour from an employee's bank would be used first; in particular, the FAA had no policy in place to determine whether the first hour earned, the hour with the lowest pay rate, or any other type of hour would be drawn first from an employee's bank. *See* Tr. 130:23–131:18 (Masson); Tr. 608:15–22 (Staley); *cf.* Tr. 499:7–9, 516:7–23 (Jensen) (noting that, from a payroll perspective, it does not matter when credit hours were earned and that, when used, credit hours were drawn hour-for-hour from an employee's bank).

Prior to 1998 an employee was not permitted to carry a balance of more than twenty-four credit hours. *Cf.* DX 1 (1998 MOU) 1.1 (confirming an agreement between NATCA and the FAA that, in the future, controllers would be able to bank more than twenty-four hours). In 1998, NATCA and the FAA entered into a Memorandum of Understanding in which the twenty-four hour cap on credit hours was removed in exchange for the union's agreement that the credit hours earned

would have no cash value. *Id.; see also* Tr. 131:19–132:1 (Masson). Accordingly, "[C]ontrollers [would] in no circumstances be able to convert unused credit hours into pay." DX 1 (1998 MOU) 1.1.

In September 2006 the twenty-four hour cap was re-instituted with the result that a controller could carry over only twenty-four credit hours from one pay period to the next. Tr. 132:11–14 (Masson); *see also* JX 2 (2006 CBA) 78. If an employee had a balance of credit hours higher than twenty-four at the time the 2006 CBA became effective, that employee could carry over his then credit hour balance, but was not eligible to earn additional credit hours until his credit hour balance fell below twenty-four hours. JX 2 (2006 CBA) 78; Tr. 364:24–365:18 (Masson).

In general, credit hours have no cash value. Once a credit hour is earned, an employee may use the credit hour to obtain an hour of leave, but generally may not elect to be paid for that hour of work or cash it out. *See* Tr. 132:2–5 (Masson). There is a limited exception to this general rule under the 2006 CBA, which applies to employees voluntarily separating from the Agency. Such employees are permitted to cash out up to a maximum of twenty-four credit hours. *See* JX 2 (2006 CBA) 78–79 ("Employees receive pay for a maximum of twenty-four (24) unused credit hours at his or her current rate of basic pay when federal employment ends, when the employee transfers to another agency, or when the employee otherwise is no longer subject to a flexible work schedule."); Tr. 318:22–321:15, 384:13–23 (Masson); Tr. 608:8–14, 611:19–612:8 (Staley). *But see* Tr. 561:5–14 (Staley) (suggesting that, under the 2006 CBA, no credit hours had any cash value); Tr. 132:11–23 (Masson) (same).

The 2009 CBA is silent on the question of credit hours, but in practice the FAA discontinued its provision of credit hours on October 1, 2009.[6] *See* Tr. 505:8–510:10 (Jensen); Tr. 556:1–3, 581:19–582:1 (Staley).

---

**6.** The court issued its first opinion on summary judgment in this case on July 31, 2008 finding the government liable on Count II of the Complaint "[b]ecause defendant's payment of hour-for-hour compensatory time and credit hours violates the FLSA requirement that overtime compensation be paid at 'one and one-half times' the employee's regular rate of pay." *Abbey I*, 82

### b. Compensatory Time

"Compensatory time is an alternative form of compensation for overtime work." Tr. 565:1–2 (Staley); *see also* JX 2 (2006 CBA) 85 (noting that "[a]t the request of an employee, the Agency may grant compensatory time off from an employee's tour of duty instead of payment for an equal amount of irregular or occasional overtime work"). Unlike credit hours, which are initially requested by the employee, earning an hour of compensatory time begins with the employer. "[W]hen a manager has a need for overtime . . . . the manager orders an employee to work overtime and then the employee may request to work [for] compensatory time as compensation in lieu of receiving the pay for that overtime work[ed]." Tr. 565:13–20 (Staley).

Any overtime hour that an employee worked and for which the employee sought compensatory time in lieu of cash compensation would be placed in the employee's bank of compensatory time which, like credit hours, was tracked on CRU–X. *See* Tr. 135:10–13, 392:10–394:9 (Masson); Tr. 510:23–511:3 (Jensen). An employee may use a banked hour of compensatory time as he would use annual leave or a credit hour in order to take an hour off of work at a later time. *See* Tr. 135:17–136:13 (Masson). Regardless of when the employee earned an hour of compensatory time, and regardless of what hourly rate the employee was paid at the time the compensatory hour was earned, if an employee wishes to use a compensatory hour, the employee is charged hour-for-hour from his banked compensatory hours. Tr. 499:7–500:4 (Jensen).

Compensatory hours have expiration dates, and when an employee wishes to use an hour of compensatory time, the hour with the earliest expiration date is used.[7] *Id.* at 497:19–23. If a compensatory hour reaches its expiration date without being used, or the employee leaves the FAA before using up all of his hours, then the value of that compensatory hour is paid out to the employee at one and one-half times the rate at which it was earned. *Id.* at 498:16–20, 507:23–508:7; JX 6 (Human Resources Policy Manual (HRPM)) ABB D 0030037. Because compensatory time must be paid out in cash to employees upon separation or upon expiration of the hours, the FAA set aside the money (at a rate of one and one-half times the employee's regular rate at the time of accrual) to pay out a compensatory hour at the time that the compensatory hour was earned. *See* Tr. 135:20–136:9 (Masson); Tr. 565:21–566:5 (Staley).

FAA policy provides that employees may not accrue more than 160 compensatory hours. Tr. 500:25–501:16 (Jensen); Tr. 556:6–22 (Staley); Tr. 383:2–18 (Masson); JX 6 (HRPM) ABB D 0030037. Between 1998 and 2007, compensatory time did not expire. *See* Tr. 500:25–501:19, 503:14–23, 508:22–509:2 (Jensen). In May 2007, OPM issued government-wide rules on compensatory time. *See* Tr. 579:14–16 (Staley). These new rules placed an expiration date of twenty-six pay periods (one year) on all hours earned after May 14, 2007. *See id.* at 579:19–23; JX 6 (HRPM) ABB D 0030037. Compensatory hours earned prior to May 14, 2007 and stored in an employee's bank were "grandfathered" and had an expiration date of May 14, 2010, three years after the OPM rules went into effect. Tr. 579:17–580:1 (Staley); JX 6 (HRPM) ABB D 0030037–38. When an employee wished to use an hour of compensatory time after the May 14, 2007 rules change, the FAA first used the hour in

---

Fed.Cl. at 745; *see also supra* Part I.A. In response to the court's decision, the FAA held "numerous meetings and discussions" and ultimately "stopped allowing compensatory time and credit hours to be earned by . . . air traffic controllers." Tr. 581:5–22 (Staley); *see also infra* Part III.C.1.

**7.** This is the most current rule. There was conflicting testimony at trial suggesting that, prior to 2007, when an hour from an employee's compensatory time bank was used, the hour used first was either: (1) the hour earned at the lowest rate, Tr. 54:16–55:1 (Staley); or (2) the hour first earned, Tr. 135:17–136:13 (Masson). After the change mandated by the Office of Personnel Management in 2007, *see supra* Part I.B.2.b, the FAA, in general, used a first-to-expire methodology for the use of compensatory time and, if two hours were to expire on the same date, used first the hour with the lowest pay rate, Tr. 590:17–591:8 (Staley); *see also* Tr. 497:16–23 (Jensen); *infra* Part III.A.3.c.

the employee's bank with the earliest expiration date, Tr. 497:19–23 (Jensen), and, if several hours had the same expiration date, used the hour with the lowest pay rate, Tr. 590:17–591:8 (Staley).

## II. Legal Standards

### A. Calculation of Back Pay

Under 29 U.S.C. § 216(b), an employee who successfully proves a violation of the FLSA is entitled to payment "in the amount of their ... unpaid overtime compensation." 29 U.S.C. § 216(b). With respect to overtime, the FLSA provides that overtime shall be paid for time worked in excess of forty hours a week "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1).

The FLSA itself provides little guidance on the proper computation of damages and courts are seldom asked to determine the precise formula to be used.[8] However, the United States District Court for the District of Columbia (D.C. District Court) has adopted the following method for the calculation of FLSA damages in a case of improperly granted compensatory time:

> [F]irst, ... determine[ ] the total hours of overtime the plaintiff worked during the violation period; second, [multiply] this number by one and a half times the plaintiff's then hourly wage to arrive at a monetary value of all overtime worked; third, [determine] the total hours of compensatory time used by the plaintiff during the violation period; fourth, [multiply] this number by the plaintiff's then hourly wage to arrive at a monetary value of all overtime compensation already received; and

fifth, [subtract] the monetary value of compensation received from the monetary value of overtime worked to arrive at the award of back pay.

*D'Camera v. District of Columbia*, 722 F.Supp. 799, 803 (D.D.C.1989). This approach was subsequently adopted by this court in *Abramson v. United States*, 42 Fed. Cl. 326, 330 (1998), a case for the recovery of back pay under the Kiess Act, 44 U.S.C. § 305 (1994). This court uses as a baseline the formula of the *D'Camera* court to evaluate plaintiffs' proposed scenarios. *See infra* Part III.A.3.

### B. Liquidated Damages and Standard for Good Faith

The FLSA requires an employer to pay an employee overtime compensation for hours worked in excess of forty hours "at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). Similarly, 5 C.F.R. § 551.501, which "supplements and interprets FLSA as it applies to federal employees," *Brooks v. Weinberger*, 730 F.Supp. 1132, 1133 n. 3 (D.D.C.1989), provides that "[a]n agency shall compensate an employee ... for all hours of work in excess of 8 in a day or 40 in a workweek at a rate equal to one and one-half times the employee's hourly regular rate of pay." 5 C.F.R. § 551.501(a) (2012). If plaintiffs have carried their burden under the FLSA to prove that defendant acted improperly in calculating plaintiffs' overtime pay or in compensating plaintiffs for overtime hours worked, then plaintiffs ordinarily are entitled to damages "in the amount of their ... unpaid overtime compensation ... and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). However,

---

8. Instead, once liability and the issues of willfulness and good faith are determined, courts frequently order the parties to stipulate (or the parties voluntarily stipulate) to an appropriate amount of damages. *See, e.g. Cooke v. United States*, 85 Fed.Cl. 325, 354 (2008) (awarding damages for violation of the FLSA based upon stipulated damages scenarios); *Astor v. United States*, 79 Fed.Cl. 303, 320 (2007) (ordering parties to file a joint status report "reflecting a calculation of damages for uncompensated overtime due each plaintiff"); *Bull v. United States* (*Bull I* ), 68 Fed.Cl. 212, 276 (2005) (ordering parties to "jointly calculate and present to the court the amount of compensation to which each representative plaintiff is entitled in accordance with the foregoing provisions of this Conclusion"), *aff'd*, 479 F.3d 1365 (Fed.Cir.2007); *Statham v. United States*, No. 00–699 C, 2002 WL 31292278, at *11 (Fed.Cl. Sept. 11, 2002) (unpublished) (ordering the parties to stipulate to the appropriate amount of damages); *Ellison v. United States*, 25 Cl.Ct. 481, 499–500 (1992) (directing the parties "to confer, develop and, within 45 days, file a stipulation setting forth the relevant amounts, *i.e.*, the computation of back pay, liquidated damages and attorney fees").

[I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.

■■■■ Under 29 U.S.C. § 216(b), the presumption is that plaintiffs are entitled to liquidated damages. "The burden rests on the government to establish its good faith and the reasonable grounds for its decision." *Adams v. United States*, 350 F.3d 1216, 1226 (Fed.Cir.2003). This burden is a "substantial" one that consists of both an objective and a subjective component. *Bull v. United States (Bull I )*, 68 Fed.Cl. 212, 229 (2005) (quoting *Laffey v. Nw. Airlines, Inc.*, 567 F.2d 429, 464–65 (D.C.Cir.1976), *overruled in part on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 134, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)), *aff'd*, 479 F.3d 1365 (Fed.Cir.2007). Establishing good faith is a subjective inquiry, and defendant must present testimony that establishes " 'an honest intention to ascertain what the [FLSA] requires and to act in accordance with it.' " *Beebe v. United States*, 226 Ct.Cl. 308, 328, 640 F.2d 1283, 1295 (1981) (quoting *Addison v. Huron Stevedoring Corp.*, 204 F.2d 88, 93 (2d Cir.1953)); *Moreno v. United States*, 88 Fed.Cl. 266, 277 (2009) (quoting *Beebe*, 226 Ct.Cl. at 328, 640 F.2d at 1295). The inquiry whether the government had reasonable grounds is an objective one, and "[p]roof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act, even though his belief is erroneous." *Beebe*, 226 Ct.Cl. at 328, 640 F.2d at 1295; *see also Adams*, 350 F.3d at

1227 (quoting same). "If . . . the employer does not show to the satisfaction of the court that he has met the two conditions mentioned above, the court is given no discretion by the statute, and it continues to be the duty of the court to award liquidated damages." 29 C.F.R. § 790.22(b) (2011).

### C. FLSA Statute of Limitations and Standard for Willful Violations

■■■■ Ordinarily, the statute of limitations in actions to recover unpaid overtime and liquidated damages under the FLSA is two years;[9] however, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). A defendant's conduct is willful under the FLSA if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin*, 486 U.S. at 133, 108 S.Ct. 1677; *see also Bull v. United States (Bull II)*, 479 F.3d 1365, 1379 (Fed.Cir.2007) (quoting *McLaughlin*, 486 U.S. at 133, 108 S.Ct. 1677). The relevant regulations state that "[r]eckless disregard of the requirements of the Act means failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104. "If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful. . . ." *McLaughlin*, 486 U.S. at 135 n. 13, 108 S.Ct. 1677. Furthermore, "If an employer acts unreasonably, but not recklessly, in determining its legal obligation," it has not willfully violated the FLSA. *Id.* Unlike the burden of proof for liquidated damages, "The burden of proving an employer's willfulness falls on the employees." *Moreno*, 88 Fed.Cl. at 277 (citing *Adams*, 350 F.3d at 1229). If the employee establishes that an employer's conduct was willful, that conduct will also "fail to meet the good faith/reasonable grounds standard for purposes of awarding

9. If a suit is brought in the United States Court of Federal Claims (Court of Federal Claims) under a particular statute with its own statute of limitations, the six-year statute of limitations provided by 28 U.S.C. § 2501 does not apply. *See Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1572 (Fed.Cir.1994) (noting that "in the absence of a specific statutory provision, a suit in

the [Court of Federal Claims] is limited by the general statute of limitations applicable to all cases in the [Court of Federal Claims]," 28 U.S.C. § 2501); *Ewer v. United States*, 63 Fed.Cl. 396, 399 (2005) (noting that the six-year statute of limitations provided by 28 U.S.C. § 2501 "does not apply when the statute under which the action is brought provides otherwise").

liquidated damages under 29 U.S.C. § 260." *Id.* (citing *Doyle v. United States*, 931 F.2d 1546, 1549 (Fed.Cir.1991) ("[A] trial court must grant the victims of a willful violation liquidated damages.")); *accord Bankston v. Illinois*, 60 F.3d 1249, 1254 (7th Cir.1995) ("It is easier for a plaintiff to receive liquidated damages under the FLSA than it is to extend the statute of limitations for FLSA claims....").

### D. Equitable Tolling

The weight of authority in the United States Court of Federal Claims (Court of Federal Claims) acknowledges that equitable tolling of the statute of limitations is available in FLSA cases under certain limited circumstances. *See, e.g., Moreno*, 88 Fed.Cl. at 280–82; *Lange v. United States*, 79 Fed. Cl. 628, 631–32 (2007) (citing, inter alia, *Ewer v. United States*, 63 Fed.Cl. 396, 402 (2005); *Hickman v. United States*, 43 Fed.Cl. 424, 427 (1999), *aff'd*, 232 F.3d 906 (Fed.Cir.2000) (table); *Udvari v. United States*, 28 Fed.Cl. 137, 139 (1993)); *Christofferson v. United States*, 64 Fed.Cl. 316, 326 (2005). *But see Doyle v. United States*, 20 Cl.Ct. 495, 499–500 (1990) (noting that because Congress has provided an extension of the limitations period for willful violations of the FLSA, equitable tolling of the FLSA statute of limitations is not available for willful violations), *aff'd*, 931 F.2d 1546 (Fed.Cir.1991). Moreover, the United States Supreme Court (Supreme Court) has held that there is a rebuttable presumption that statutes of limitations may be equitably tolled in suits against the United States. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). *But see John R. Sand & Gravel Co. v. United States (John R. Sand)*, 552 U.S. 130, 133–34, 139, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008) (holding that the six-year statute of limitations in 28 U.S.C. § 2501 that generally governs in the Court of Federal Claims is jurisdictional and not subject to equitable tolling); *see also FloorPro, Inc. v. United States*, 680 F.3d 1377, 1382 (Fed.Cir. 2012) (interpreting *John R. Sand* and concluding that "section 2501 sets forth an 'absolute' time limit for filing suit in the Court of Federal Claims").

The Court of Federal Claims has found it appropriate to toll the FLSA statute of limitations when, for example, plaintiff can show "that there was a defective pleading filed during the statutory period," or that "the plaintiff has been induced or tricked by the defendant's misconduct into allowing the filing deadline to pass," *Christofferson*, 64 Fed. Cl. at 326; *see also Irwin*, 498 U.S. at 96, 111 S.Ct. 453; *Hickman*, 43 Fed.Cl. at 427.

### E. Attorneys' Fees and Costs

If plaintiffs carry their burden of proving a violation of the FLSA, the court is also required, "in addition to any judgment awarded to the plaintiff or plaintiffs, [to] allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." [10]  29 U.S.C. § 216(b).[11]

---

**10.** Citing "the Back Pay Act, 5 U.S.C. § 5596," plaintiffs initially claimed that they "are entitled to recover interest on their back pay damages for the defendant's failure to pay them overtime compensation." Fifth Am. Compl., Dkt. No. 69, ¶ 32. The court notes that plaintiffs filed six amended complaints in this matter. The quoted statement appears in plaintiffs' Fifth Amended Complaint, but appears to have been inadvertently cut short in paragraph thirty-two of plaintiffs' most recent Sixth Amended Complaint. The court therefore cites to plaintiffs' Fifth Amended Complaint.

"Interest on a claim against the United States shall be allowed in a judgment by the United States Court of Federal Claims only under a contract or Act of Congress expressly providing for payment thereof," 28 U.S.C. § 2516(a) (2006), or where a "judgment against the United States [has been] affirmed by the Supreme Court after review on petition of the United States," 28 U.S.C. § 2516(b). Plaintiffs and defendant later stipulated that plaintiffs are not entitled to interest under the Back Pay Act. *See* Joint Supplemental Resp., Dkt. No. 233, at 1 ("[T]he parties agree that the plaintiffs are not entitled to interest under the Back Pay Act or under an agency rule or regulation.").

**11.** Ordinarily, under Rule 54(d)(2)(A), "A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." RCFC 54(d)(2)(A). In FLSA cases, however, courts have found it appropriate to award attorney's fees to a prevailing plaintiff pursuant to the statute and without a motion. *See, e.g. Bull I*, 68 Fed.Cl. at 276; *Cooke*, 85 Fed.Cl. at 354.

## III. Discussion

### A. Calculation of Damages for Back Pay

█ The court has determined that "defendant's payment of hour-for-hour compensatory time and credit hours violates the FLSA requirement that overtime compensation be paid at 'one and one-half times' the employee's regular rate of pay." *Abbey I*, 82 Fed.Cl. at 745 (quoting 29 U.S.C. § 207(a)(1)). Plaintiffs and defendant disagree over the formula that should be used to calculate the back pay compensation owed to plaintiffs.

### 1. Plaintiffs' Proposed Calculations: Three Scenarios

Plaintiffs' expert, Dr. Louis R. Lanier, *see supra* note 3, describes in his report three possible methods (and additional variations within each method) of calculating the damages for back pay owed to plaintiffs as a result of defendant's improper grant of compensatory time and credit hours rather than monetary overtime compensation, *see* Pls.' Ex. (PX) 6 (Lanier Report) [12] 11–12.

In Scenario One, Dr. Lanier included

credit hours earned and not used during the statutory recovery period (valued at 1.5 times the regular rate at which they were earned), and credit hours and comp[ensatory] time earned and used during the statutory recovery period (valued at 0.5 times the regular rate at which they

were earned, using the [First In First Out (FIFO) ] methodology).

*Id.* App. D at 2. In terms of the formula used by the *D'Camera* court, the court understands that damages would be calculated by first totaling the number of credit hours worked by a particular plaintiff during the statutory recovery period and multiplying that number by 1.5 times that plaintiff's regular rate of pay at the time that the plaintiff earned the hour. From that total amount of overtime compensation for total credit hours earned is subtracted the total credit hours used by that plaintiff multiplied by the plaintiff's regular rate of pay. To the amount resulting from the foregoing calculation of back pay for credit hours is added the value of total compensatory hours earned and used by each plaintiff during the statutory recovery period, multiplied by 0.5 times the plaintiff's regular rate at the time the hour was earned.[13]

The foregoing formula pays plaintiffs one-and-one half times their regular rate of pay for every credit hour earned and not used during the statutory recovery period, but gives the government credit for the compensatory time and credit hours earned and used by plaintiffs during the recovery period. With respect to compensatory time and credit hours earned and used, in Scenario One plaintiffs are compensated at one-half times their regular rate of pay in recognition of the fact that they received the benefit of the hour used. According to Dr. Lanier, this method would read: [credit hours earned and not used during recovery period × (1.5 × plaintiff's regular rate of pay @ time earned) ] + [compensatory time and credit hours earned and used during recovery period × (0.5 × plaintiff's regular rate of pay @ time earned) ] = back pay damages owed under Scenario One.

Note that although the two formulas differ slightly—with the *D'Camera* method totaling the value of all credit hours and subtracting the value of credit hours used before adding the value of compensatory hours used and Dr. Lanier's method totaling the value of credit hours earned and not used and then adding the value of credit hours and compensatory time earned and used—both formulas yield the same result.

The more detailed formula actually used by Dr. Lanier can be found at Appendix C to plaintiffs' Exhibit 6 (Lanier Report).

---

12. The court notes that PX 6 (Lanier Report) includes two reports: one entitled Supplemental Expert Report of Louis R. Lanier, Ph.D., dated January 6, 2012, and, after an unnumbered tab, a report entitled Second Supplemental Expert Report of Louis R. Lanier, Ph.D., dated February 23, 2012. When the court cites PX 6 (Lanier Report), the court is referring to the Second Supplemental Report unless otherwise indicated.

13. A mathematical representation of this equation is: [(credit hours earned during recovery period × (1.5 × plaintiff's regular rate of pay @ time earned)) − (credit hours used during recovery period × plaintiff's regular rate of pay @ time earned) ] + [compensatory hours earned and used during recovery period × (0.5 × plaintiff's regular rate of pay @ time earned) ] = back pay damages owed under Scenario One.

A mathematical representation of the formula Dr. Lanier briefly describes in his expert report

gives no value to compensatory or credit hours accumulated before the statutory recovery period.[14] Tr. 262:14 (Lanier); *id.* at 251:17–252:6.

In Scenario Two, Dr. Lanier included credit hours earned and not used during the statutory recovery period (valued at 1.5 times the regular rate at which they were earned), and credit hours and comp[ensatory] time earned and used during the statutory recovery period (valued at 0.5 times the regular rate at which they were earned, using the FIFO methodology). This scenario also includes the value of credit hours and comp[ensatory] time earned prior to the statutory damages period and used during the damages period (valued at 0.5 times the regular rate in effect at the beginning of the damages period), and credit hours earned prior to the statutory damages period and not used (valued at 1.5 times the regular rate in effect at the beginning of the damages period).

PX 6 (Lanier Report) App. D at 3.[15] The only difference between Scenario One and Scenario Two is that, in Scenario Two, Dr. Lanier valued credit hours and compensatory time earned prior to the statutory period and used during the period, as well as credit hours earned prior to the recovery period and not used. *See id.;* Tr. 253:13–14 (Lanier); *id.* at 254:6–7. In Scenario Two, the government still receives credit for compensatory hours used by plaintiffs, but plaintiffs are compensated for all credit and compensatory time

hours, no matter when the hours were earned.

In Scenario Three, Dr. Lanier included all credit hours and comp[ensatory] time earned during the damages period [valued] at 1.5 times the regular rate in effect when they were earned, using the FIFO methodology. (The exception to this rule is that unused comp[ensatory] time is assumed cashed out and assigned a value of zero). No value is placed on credit hour or comp[ensatory] time usage.

PX 6 (Lanier Report) App. D at 4. In Scenario Three, no credit is given to the government for the compensatory time and credit hours earned and used by plaintiffs during the recovery period. There is no distinction made between hours earned and not used and hours earned and used; Scenario Three reflects an assumption that plaintiffs received no benefit from using an hour of compensatory time or a credit hour and that, whether the hours were used or not, plaintiffs must be compensated at 1.5 times their regular rate of pay.

In each of his proposed scenarios, Dr. Lanier made several assumptions. First, he assumed, in general, a FIFO method for the use by plaintiffs of compensatory time and credit hours. The earliest-earned credit hours and compensatory time are assumed to be used first and, therefore, "Ending balances of credit hours and comp[ensatory] time are . . . assumed to consist of the most [ ] recently earned hours." [16] *Id.* at 5. How-

---

14. The government argues that, although Dr. Lanier's Scenario One does not compensate plaintiffs outright for compensatory time and credit hours earned prior to the statutory cut-off, those hours are nevertheless factored into the calculation and therefore given value in contravention of the statute of limitations. Def.'s Post–Trial Br. (Def.'s Br.), Dkt. No. 268, at 23 ("By assuming that hours used during the statutory period come from the bank of credit hours earned before the statutory period, Dr. Lanier preserved a greater number of the credit hours earned during the statutory period, thus increasing plaintiffs' damages."). The court addresses this argument in the section of the opinion regarding plaintiffs' use of the first-in-first-out (FIFO) method. *See infra* Part III.A.3.c.

15. All three scenarios also include a payout for plaintiffs' regular rate claims (resulting from the

FAA's omission of organizational success increase, superior contribution increase and retention incentive payments in calculating plaintiffs' regular rate of pay) set forth in Count I of plaintiffs' Complaint. Because the parties have agreed to pursue settlement of Count I, *see* Order of Mar. 1, 2012, Dkt. No. 251, at 1, the court disregards the inclusion of the regular rate claims in all scenarios.

16. Several additional assumptions follow Dr. Lanier's use of FIFO. For instance, Dr. Lanier assumed that "if the balance of credit hours [or compensatory time] at the end of the damages period is *greater than or equal to* the amount of credit hours earned during the damages period, . . . [then] all hours earned during the damages period were not used." PX 6 (Lanier Report) 7, 9. Similarly, Dr. Lanier assumed that "if the balance credit of hours [or compensatory time]

ever, Dr. Lanier used a modified FIFO methodology "in order to take into account the April 2007 change in OPM rules for comp[ensatory] time." *Id.* Dr. Lanier describes this modified methodology as follows:

> Beginning in the tenth pay period of 2007, FIFO is applied to the first comp[ensatory] time earned since that pay period. Only when all comp[ensatory] time earned since the tenth pay period of 2007 is used or expired, are comp[ensatory] time hours earned prior to the tenth pay period of 2007 assumed used—as always, using the FIFO method. In other words, the balance of comp[ensatory] time hours earned prior to the OPM rules change does not get tapped unless the balance of comp[ensatory] time hours earned after the OPM rules change goes to zero.

*Id.* As a further result of the 2007 OPM rules change, Dr. Lanier assumed that any banked or grandfathered compensatory time that was set to expire on May 14, 2010 was cashed out at 1.5 times the regular rate of pay. *Id.* at 5–6, 9. Dr. Lanier also assumed that any balance of compensatory time existing as of September 30, 2009 was paid out by the FAA at 1.5 times the regular rate. *Id.* at 9. This results in zero damages for compensatory time earned and not used in all three scenarios. *Id.*

Plaintiffs argued in their pretrial briefing that Scenario Three is the "simplest and cleanest calculation and reflects the reality that defendant was obligated to compensate the plaintiffs with cash for working overtime and should not have simply given them time off from work as compensation for working overtime." Pls.' Mem. 9.[17] According to plaintiffs, "defendant should be entitled to no 'credit' for their reckless violation of the FLSA," and therefore no value should be attributed to credit hours and compensatory time used by plaintiffs. *Id.* at 38. Instead, plaintiffs argue, they are entitled to compen-

sation at the rate of 1.5 times their regular rate of pay for all compensatory time and credit hours earned regardless of whether they were used. *Id.*

With respect to all three scenarios, plaintiffs argue that the proper rate of pay to apply in calculating damages is a plaintiff's pay rate at the time that the compensatory time or credit hour was earned. *Id.* at 36–37 ("[P]laintiffs calculated damages at the rate at which the controller earned the hour."); *see also* Pls.' Br. 38–40. Even if the employee later received a raise and then used a compensatory hour, plaintiffs argue that the proper formula should apply a controller's regular rate of pay at the time the controller earned the hour. Notwithstanding the foregoing, plaintiffs' counsel instructed Dr. Lanier to do offset calculations that would account for any difference in a plaintiff's salary between the time when a compensatory or credit hour was earned and when it was used. *See* PX 6 (Lanier Report) App. D at 1; *id.* at 2–3 (applying offset in calculating damages for Scenarios One A, One B, Two A, and Two B).

Plaintiffs also defend Dr. Lanier's FIFO assumption, arguing that, although the FAA claims to use a first to expire method rather than FIFO in determining which compensatory time or credit hours would be used first, the two methods are functionally equivalent. Pls.' Mem. 35–36; Pls.' Br. 36–38.

### 2. Defendant's Proposed Changes to Plaintiffs' Calculations

Defendant did not put on its own expert to testify regarding calculation of damages. Defendant does, however, find fault with certain of Dr. Lanier's assumptions with respect to damages calculations and disagrees with plaintiffs as to the scenario that best represents the amount plaintiffs are owed.[18]

---

at the end of the damages period is *less than* the amount of credit hours [or compensatory time] earned during the damages period, ... [then] all credit hours [and compensatory time] earned during the damages period—except for the ending balance—were used during the damages period." *Id.* at 7.

**17.** Plaintiffs do not renew their argument in favor of Scenario Three in their post-trial brief, instead simply arguing that the court should adopt one of the three scenarios proposed by plaintiffs. *See* Pls.' Post Trial Br. (Pls.' Br.), Dkt. No. 269, at 47–49.

**18.** Defendant also raised, for the first time in its post-trial briefing, the argument that Dr. Lanier's

Defendant argues that the government must be given a credit or offset for credit hours and compensatory hours that plaintiffs used. Def.'s Mem. 38–42; Def.'s Br. 35. According to defendant, plaintiffs would receive a windfall if they were permitted to recover the full amount of 1.5 times their regular rate of pay when they used compensatory time and credit hours, in other words, took leave for which they had already been paid at their regular rate of pay. Def.'s Mem. 39. Defendant argues that Scenario Three is unacceptable because it pays plaintiffs the same amount—1.5 times their regular rate—for each hour earned, regardless of whether plaintiff used the hour or not. Defendant acknowledges that, in Scenarios One and Two, "plaintiffs properly assume that any monies already paid them for compensatory time or credit hours used will be subtracted from the overtime pay due them." *Id.* at 38; *cf.* Def.'s Br. 35.

Defendant also argues that it would be improper to compute plaintiffs' damages solely according to the regular rate of pay in effect at the time that each plaintiff earned their compensatory time or credit hours. Def.'s Mem. 13–14. Defendant argues that calculating damages using plaintiffs' regular rate of pay in effect at the time plaintiff earned the compensatory hour is "erroneous" because the calculation fails to account for pay increases. *Id.* at 14. For example, if a plaintiff received a raise in between the time at which she earned the hour and the time at which she used the hour, then, defendant contends, the hour of compensatory time was worth more at the time she used it than at the time she earned it (the difference in value measured by the increase in her hourly pay). *See id.* at 13–14. Defendant contends that Dr. Lanier's calculations are incorrect because he failed to account for pay increases. *Id.*

With regard to Dr. Lanier's assumption of a FIFO method for use of compensatory and credit hours, defendant argues that the assumption does not reflect the FAA's practice. According to defendant, this is because

> the FAA did not use the FIFO method to determine which compensatory hours were used. Prior to May 2007, the FAA used a lowest rate first method. That is, the compensatory hour in an employee's bank that had the lowest associated pay rate, was the first hour used.

*Id.* at 13; Def.'s Br. 22, 37–38. After the May 2007 regulatory change, "the FAA began using a 'first to expire' methodology. That is, the compensatory hour in an employee's bank that would expire first was the first hour used." Def.'s Mem. 13; Def.'s Br. 22–23. Although Dr. Lanier used a first-to-expire method for compensatory time after 2007, *see* Tr. 238:6–240:10 (Lanier), defendant argues that Dr. Lanier failed to account for the fact "that after May 2009, hours of compensatory time earned prior to May 2007, began to have earlier expiration dates than ones earned after May 2007," Def.'s Br. 23, with the result that, as Mr. Staley testified, Dr. Lanier's methodology did not properly account for the expiration dates of hours of compensatory time:

> In May 2009 you will begin looking at that old comp[ensatory] time again because the May 2010 will expire before that is 26 pay periods old.... So you have to go back and start your methodology back to the original after May 2009[,]

Tr. 590:17–23 (Staley).

At trial, Mr. Staley expressed an additional concern about Dr. Lanier's use of the FIFO methodology, stating that this method "would then include the credit hours that were in effect prior to these claims and the statute of limitations on FLSA to my knowledge." *Id.* at 585:9–13. According to Mr. Staley, "when you use the first in/first out method, you are

---

testimony is insufficient because Dr. Lanier did not opine as to which of the three scenarios was the proper choice in this case. *See* Def.'s Br. 21, 35, 38. However, it is for the court to decide, on the basis of the evidence presented at trial, which scenario proposed by plaintiffs, if any, represents a proper calculation of plaintiffs' back-pay damages. Dr. Lanier was qualified by the court as

an expert in "[t]aking raw pay data and performing back-pay calculations based on instructions from counsel," Tr. 230:24–231:6 (the court), and, as such, would not be expected to opine on the legal question of which proposed scenario best represents an accurate calculation of plaintiffs' FLSA damages.

subtracting all along the way ... as a credit hour is used you're subtracting from that pre-statutory period." *Id.* at 587:5–8. Mr. Staley criticized Dr. Lanier's failure correctly to characterize and quantify hours earned and not used:

> [T]he portion that [Dr. Lanier] says [is] earned not used, that's not a true statement because ... those hours may have been used. [An employee] may have earned an hour in 2005 but had hours from 2004. He may use an hour in 2006. [Dr. Lanier] is drawing from that hour that was earned pre 2004 before he looks at the hours 2005 and forward.

*Id.* at 587:11–17.

While defendant acknowledges that, in Scenario One, Dr. Lanier does not include damages for credit hours and compensatory time earned prior to the statutory recovery period, defendant contends that Dr. Lanier's use of the FIFO methodology nevertheless gives some value to pre-statutory period hours.[19] Def.'s Br. 23. This is because the earliest-earned hours (which would include pre-statutory period hours) are deemed used first, which results in maximizing the amount of damages plaintiffs can recover for hours earned during the period because more of these hours will be deemed "earned and not used" (valued at 1.5 times the regular rate) rather than "earned and used" (valued at only 0.5 times the regular rate). *See* Def.'s Br. 23 ("By assuming that hours used during the statutory period come from the bank of credit hours earned before the statutory period, Dr. Lanier preserved a greater number of the credit hours earned during the statutory period, thus increasing plaintiffs' damages."). According to defendant, "credit hours earned prior to the statutory period have no relevance to this lawsuit and should not affect the calculation of plaintiffs' damages." *Id.*

At trial, defendant also presented testimony that suggested additional limitations of Dr. Lanier's calculations.[20] Mr. Staley expressed concern that the formula used by Dr. Lanier to calculate each plaintiff's regular rate of pay (contained in PX 6 (Lanier Report) App. C) "does not follow the rules that OPM prescribes for computing the regular rate in 5 CFR part 551." Tr. 592:8–12 (Staley); *see also* Def.'s Br. 21, 37. In particular, Mr. Staley noted that the number codes 101, 10B, 10S, 102 and 104, which are the FAA codes for leave without pay and other without-pay codes, were included in Dr. Lanier's regular rate derivation. *Id.* at 593:20–594:13. According to Mr. Staley, "For the regular rates you use total remuneration divided by the total number of hours worked. So leave without pay would include hours that were not worked so therefore [the formula] must be including somehow, referencing somehow hours that were not worked." Tr. 594:2–7 (Staley); *see also* Def.'s Br. 21.[21]

---

**19.** Plaintiffs contend that this argument is untimely because not raised prior to trial. *See* Pls.' Br. 40–45. However, defendant raised in its Memorandum of Contentions of Facts and Law, filed prior to trial, both its concern about Dr. Lanier's use of the FIFO method for calculating damages, and its concern about valuing pre-statutory period hours. *See* Def.'s Mem. of Contentions of Fact and Law, Dkt. No. 232, at 13–15, 42–46. Defendant's argument at trial and in its post-trial brief that an additional problem with the use of FIFO is that it would result in contravening the statute of limitations appears to be subsumed within the timely, more general, arguments made in defendant's pretrial Memorandum. In any case, the issue is mooted by the court's determination that Dr. Lanier's use of FIFO does not contravene the statute of limitations. *See infra* Part III.A.3.c.

**20.** Plaintiffs also argue that defendant's arguments regarding Dr. Lanier's calculation of the regular rate of pay are untimely because not raised prior to trial although defendant had a copy of Dr. Lanier's expert report for some time before trial. Pls.' Br. 40–43, 45–46. The court addresses the timeliness issue in Part III.A.3.e. *See infra* Part III.A.3.e.

**21.** Defendant presented two additional arguments for the first time in post-trial briefing. Defendant argues that:

> [T]his Court's 2008 decision finds only that the FAA erred in granting plaintiffs' compensatory time and credit hours for hours worked in excess of 40 hours in a week. Pursuant to FAA policy, however, plaintiffs earn compensatory time and credit hours for hours worked in excess of eight hours in a day even when they work less than 40 hours in a week. Dr. Lanier's calculations do not separate those compensatory and credit hours that plaintiffs earned during weeks when they worked less than 40 hours. In this regard we also note that, pursuant to the FLSA, only hours of work count toward the 40-hour workweek, while

### 3. Decision With Respect to Calculation of Damages

The FLSA gives little guidance about the calculation of damages. The statute states, "Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

The court finds that the straightforward formula, stated in *D'Camera* and adopted by this court in *Abramson, see supra* Part II.A, provides a fair approach to calculation of damages in an FLSA case where the government has improperly provided compensatory time or credit hours in lieu of overtime. Accordingly, the court determines that it is appropriate in this case to: (1) determine the total compensatory time and credit hours the plaintiff worked during the statutory recovery period; (2) multiply this number by one and one-half times the plaintiff's hourly wage at the time the hour was earned to arrive at a monetary value of all compensatory time and credit hours worked; (3) determine the total hours of compensatory time and credit hours used by the plaintiffs during the statutory recovery period; (4) multiply this number by the plaintiff's hourly wage at the time the hour was earned (and add to this amount the sum already paid to plaintiffs in compensation for unused compensatory time) to arrive at a monetary value of all compensation already received; and (5) subtract the monetary value of compensation received from the monetary value of compensatory time and credit hours worked to arrive at the award of back pay. *See D'Camera*, 722 F.Supp. at 803.

For the most part, the formula used by plaintiffs' expert in Scenario One is faithful to the *D'Camera/Abramson* method. Scenario One values credit hours earned and not used at 1.5 times each plaintiff's regular rate of pay (assuming that compensatory time earned and not used was already cashed out by the FAA and time-and-one-half) and values credit hours and compensatory time earned and used at 0.5 times each plaintiff's regular rate of pay. The court therefore approves Scenario One generally for the calculation of plaintiffs' damages for the reasons, and subject to the exceptions, set out below.

a. Because, as Set Forth in Scenario One, the Government Is Entitled to an Offset for Compensatory Time and Credit Hours Earned and Used, Calculation of Back Pay Under Scenario Three Would Be Inappropriate

The government is entitled to an offset for compensatory time and credit hours used by plaintiffs. *See Abramson*, 42 Fed.Cl. at 330 n. 5; *D'Camera*, 722 F.Supp. at 803; *cf. Fed. Air Marshals v. United States*, 84 Fed.Cl. 585, 596 (2008) ("[P]laintiffs are not entitled to a windfall of an additional payment at one and one-half times their regular rate for hours for which they have already been compensated."). Plaintiffs are not entitled to recover an amount equal to the full amount of back pay for overtime hours worked and used because this would result in a windfall to plaintiffs. Although the FAA did not act in accordance with the law in awarding compensatory time and credit hours instead of monetary overtime compensation, plaintiffs did receive the benefit of using the compensatory time and credit hours that they earned.

Accordingly, plaintiffs may recover 1.5 times their regular rate of pay for compensatory time and credit hours earned and not used (the unused compensatory time having already been cashed out and therefore not included in the calculation of damages), but their recovery for hours earned and used is limited to 0.5 times their regular rate of pay.

pursuant to FAA policy, hours of leave as well as compensatory and credit hours used count toward the 40-hour workweek. Dr. Lanier's calculations do not appear take these differences into account.
Def.'s Br. 24 (internal citations omitted). In the absence of an explanation as to how these dis-

tinctions (mentioned only in the quoted paragraph and not explained further by defendant) might actually impact the calculation of plaintiffs' damages, the court declines to speculate as to how, if at all, these untimely alleged omissions by Dr. Lanier could be a subject of concern.

This calculation recognizes that plaintiffs effectively received compensation at a straight time rate when they were permitted to take leave by using an hour of compensatory time or a credit hour and still receive their regular rate of pay for that hour. The court finds that it is just and reasonable to grant the government an offset for compensatory and credit hours both earned and used by plaintiffs. By contrast, proposed Scenario Three, which provides for no such offset for the government to be included in calculating back pay, does not provide an appropriate formula for calculating plaintiffs' damages.

b. Plaintiffs Are Not Entitled to Scenario Two Damages for Pre–Statutory Period Hours

■ With regard to plaintiffs' claim for pre-statutory period hours, plaintiffs are not entitled to back pay compensation for overtime hours worked prior to the statutory recovery period. Permitting plaintiffs to recover for hours worked before the cut-off date for the recovery period would violate the statute of limitations. *See* 29 U.S.C. § 255(a) (providing that a cause of action under the FLSA "shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued"). Plaintiffs therefore may not recover damages for overtime hours worked before the statutory recovery period unless entitled to equitable tolling of the statute of limitations. *See infra* Part III.C.2. Plaintiffs' proposed Scenario Two, which permits plaintiffs to recover damages both for credit hours and compensatory time earned prior to the statutory period and used during the period and for credit hours earned prior to the recovery period and not used, does not provide an appropriate formula for calculating damages. *See* PX 6 (Lanier Report) App. D at 3.

c. Use of the FIFO Method Is, in General, Appropriate, and Does Not Result in the Award of Damages for Pre–Statutory Period Hours

■ Defendant suggests that Scenario One would result in compensating plaintiffs for hours earned prior to the statutory period because, although no damages are awarded for those hours, the hours are given value by being assumed to be used first under the FIFO method. Def.'s Br. 23; *cf.* Tr. 585:9–13, 587:2–17 (Staley) (stating that it was incorrect for Dr. Lanier to characterize Scenario One as excluding pre-statutory period hours because, under the FIFO method, "as a credit hour is used you're subtracting from that pre-statutory period"). In defendant's view, the FIFO method results in pre-statutory period hours being assumed to be first-used, thereby maximizing the amount of hours earned during the statutory period that are earned and not used (and compensated at a rate higher than hours earned and used). Defendant also contends that plaintiffs' use of the FIFO method is incorrect because it is not consistent with the FAA's policy. Def.'s Mem. 13.

The FAA's policy on the use of credit hours and compensatory time provides a context in which to consider this issue. Witness testimony at trial indicated that the FAA did not track when credit hours were earned. Credit hours went into a bank and all the banked hours were treated equally; when an employee went to use a credit hour, an hour was drawn from the bank without regard to when or at what rate of pay that hour was earned. Tr. 130:23–131:18 (Masson); Tr. 608:15–22 (Staley); *cf.* Tr. 499:7–9, 516:7–23 (Jensen).

With respect to compensatory time, there was conflicting testimony that suggested that, prior to 2007, when an hour from an employee's compensatory time bank was used, the hour used first was either: (1) the hour earned at the lowest rate, Tr. 54:16–55:1 (Staley); or (2) the hour first earned, Tr. 135:17–136:13 (Masson). After the change mandated by OPM in 2007, *see supra* Part I.B.2.b, the FAA used a first-to-expire methodology for the use of compensatory time and, if two hours were to expire on the same date, used first the hour with the lowest pay rate, Tr. 590:17–591:9 (Staley); *see also* Tr. 497:16–23 (Jensen). For these reasons, and because the FAA put aside funds to compensate employees at 1.5 times the regular rate

at the time that a compensatory hour was earned, the FAA tracked the pay rate at which compensatory hours were earned. Tr. 135:17–136:13 (Masson).

Regarding credit hours, the court finds Dr. Lanier's use of the FIFO method to be appropriate. Testimony at trial showed that the FAA did not have a policy regarding which credit hour—drawn from a bank of credit hours—was to be used first. For purposes of calculating damages, however, the court must choose a method for the use of credit hours in order to determine how to value plaintiffs' credit hours.

In an analogous circumstance, where the government or another employer has failed to keep adequate records (rather than, as here, failing to establish a relevant policy), the Supreme Court has held, with respect to FLSA damages, that the "employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co. (Mt. Clemens* ), 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), *superseded in part by 29 U.S.C. §§ 251–62.* "The burden then shifts to the employer to come forward with evidence ... to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687–88, 66 S.Ct. 1187. The Supreme Court noted that, if a plaintiff were not permitted to recover in such a situation, it "would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act." *Id.*

Defendant's failure to establish a policy on the use of credit hours is sufficiently analogous to the failure of the *Mt. Clemens* defendant to keep adequate records to cast on defendant the burden to show that plaintiffs' use of the FIFO method with respect to credit hours is unreasonable. Plaintiffs' FIFO assumption, that the first credit hour earned is the first credit hour used, is a "just and reasonable inference" with respect to the use of credit hours and defendant has offered no evidence or valid reason why, in the absence of an established FAA policy, plaintiffs' FIFO method should not be adopted with respect to credit hours.

With respect to compensatory time, the court must evaluate whether plaintiffs' proposed FIFO method is reasonable as to the pre–2007 time period, and whether the proposed first-to-expire method (modified by FIFO where two hours expire on the same date) is reasonable as to the post–2007 time period.

The court heard conflicting testimony regarding the use of compensatory time before 2007. The court found both witnesses, Mr. Masson and Mr. Staley, to be credible and knowledgeable concerning the accrual and use of compensatory time. Mr. Masson testified that compensatory time was used based on a first-earned, first-used (in other words, FIFO) method, while Mr. Staley testified that the compensatory hour earned at the lowest rate was used first. *See* Tr. 54:16–55:1 (Staley); Tr. 135:17–136:13 (Masson). In these circumstances, the court finds it appropriate to consider whether these two accounts can be reconciled. In most cases, it is likely that an hour of compensatory time used, if chosen at the lowest rate, would also be the hour first earned, and vice versa, assuming that a controller's salary increases over time. This may not be true in all circumstances, for instance, where a controller who earned a type of incentive pay during one period in his career no longer earns that incentive pay during a later period. *Cf.* Tr. 250:19–251:12 (Lanier). The court finds it reasonable, however, to assume that where two credible and knowledgeable witnesses give slightly different accounts of the FAA's policy on the use of compensatory time, the two policy variations would likely result in a very similar outcome. Based on the foregoing assumption, and because neither plaintiffs nor defendant presented any evidence or testimony that would establish which policy was actually in use by the FAA before 2007, the court adopts the first-earned, first-used, or FIFO, method proposed by plaintiffs with respect to pre–2007 compensatory time.

Mr. Staley and Ms. Jensen testified that, after the 2007 rules change, the FAA moved to a first-to-expire method for compensatory time, *see* Tr. 497:19–23 (Jensen); Tr. 589:3–18 (Staley), with the additional nuance, according to Mr. Staley, that if two hours expired on the same day, the hour earned at the lowest rate was used first, *see* Tr. 590:17–591:10 (Staley). Plaintiffs' expert adopted a first-to-expire method for calculating credit hour use after May 2007, but where two hours were set to expire on the same day, used first the hour first earned rather than the hour earned at the lowest rate. *See* Tr. 238:6–240:10 (Lanier). The court agrees that, in general, it was proper for plaintiffs' expert to use a first-to-expire method for compensatory hours used after May 14, 2007, because this corresponds to the general FAA policy.

However, plaintiffs' expert erred in adopting a FIFO method with respect to hours set to expire on the same date, where the FAA policy dictates in such circumstances that the first hour used should be the hour with the lowest pay rate. While there may be significant overlap between hours that are the earliest earned and hours that were earned at the lowest rate, as described with respect to pre–2007 compensatory time, *see supra* Part III.A.3.c, regarding post–2007 hours, there is no conflicting testimony for the court to reconcile. As to post–2007 hours, there was uncontroverted testimony by Mr. Staley that the FAA's policy was to use first the hour earned at the lowest rate when two hours were set to expire on the same day. In the absence of testimony or evidence offered by plaintiffs to the contrary, the court finds that the damage calculations with respect to post–2007 compensatory time should mirror the FAA policy and use a first-to-expire method, modified in a case where multiple hours expire on the same day so that the hour earned at the lowest rate is deemed to be used first.

The court now considers whether plaintiffs' use of FIFO improperly values pre-statutory period hours. Dr. Lanier's Scenario One does not award any damages for pre-statutory period hours. However, defendant argues that the method nevertheless results in a statute of limitations issue because Dr. Lani-er's use of FIFO draws first from banked hours that were earned earliest (perhaps prior to the statutory period) in determining the number of hours used. Def.'s Br. 23. According to defendant, "By assuming that hours used during the statutory period come from the bank of credit hours earned before the statutory period, Dr. Lanier preserved a greater number of the credit hours earned during the statutory period, thus increasing plaintiffs' damages." *Id.*

Dr. Lanier's use of the FIFO method—which, in some circumstances, draws the hours used from a bank of hours that may have been earned prior to the statutory period—does not result in the award to plaintiffs of damages for any hours earned prior to the statutory period. Regardless of FIFO, the court awards damages only with respect to hours earned during the statutory period.

Consider the example of a controller who has a bank of ten credit hours at the beginning of the statutory period. During the two years that represent the statutory period, *see infra* Part III.C.1, assume that the controller has earned an additional five credit hours and has used three credit hours. The FAA's practice with respect to credit hours is that, when a controller wished to use an hour, an hour was drawn from the bank without regard to when or at what rate the hour was earned. *See supra* Part III.A.3.c. Consequently the court found it appropriate, in the absence of another policy, to adopt plaintiffs' expert's FIFO method. *See supra* Part III. A.3.c. Following the FIFO method, then, when the hypothetical controller went to use his three hours, the hours would have been drawn from the bank of ten credit hours and not from the additional five credit hours earned during the two-year limitations period. At the end of the period, plaintiff has earned five credit hours, has not used any of those five hours, and therefore is entitled to 1.5 times his regular rate of pay as back pay for those five overtime hours. No damages are awarded with respect to the seven unused pre-statutory period hours, or the three pre-statutory period hours that were used during the limitations period.

Defendant attempts to associate the damages award with the FIFO method, but, in fact, Dr. Lanier's use of FIFO does not

award damages for pre-statutory period hours. Instead, defendant's suggestion that Dr. Lanier's method gives some value to pre-statutory period hours is merely an attempt to decrease plaintiffs' damages by decreasing the number of hours deemed earned and not used (which are paid out at 1.5 times the regular rate of pay instead of 0.5 times the regular rate at which hours earned and used are paid out). The use of FIFO does not award damages for pre-statutory period hours and defendant's alternative would unfairly decrease plaintiffs' damages.

d. The Proper Calculation of Damages Values a Compensatory or Credit Hour at the Controller's Regular Rate at the Time the Hour Was Earned

█ Plaintiffs' back pay is properly computed by using plaintiffs' regular rate of pay at the time that the credit hour or compensatory time was earned, not plaintiffs' regular rate at the time the hour was used. Accordingly, defendant is not entitled to an offset that accounts for any difference between plaintiffs' regular rate of pay at the time that an overtime hour was earned and the regular rate at the time the hour was used.

Plaintiffs' expert assumed that the proper rate at which to value a credit hour or compensatory time was the rate at which the controller earned the hour or time. *See* PX 6 (Lanier Report) 6 (noting that credit hours or compensatory time were valued using the "regular rate in effect at the time they were earned"). Defendant argues that this results in a windfall to plaintiffs. Def.'s Mem. 14. Defendant's argument seeks to diminish plaintiffs' damages by increasing the value of the used compensatory time or credit hours that must be subtracted from the total value of overtime hours worked. Under defendant's theory, if a plaintiff earned a credit hour or an hour of compensatory time when he was earning $30 per hour, but used the hour after he had received a raise and was earning $36 per hour, the value of the hour used should be $36—not $30—because when

plaintiff used the hour, his then current salary was $36.

Testimony at trial established that the FAA's policy was to compensate plaintiffs with credit hours and compensatory time hour-for-hour. Tr. 55:21–60:8 (Staley); Tr. 131:14–18, 136:14–137:24 (Masson); Tr. 211:21–212:1 (Markel); Tr. 516:7–517:17 (Jensen). When a plaintiff earned a compensatory or credit hour, she could use that hour later, hour-for-hour, without regard to any interim salary increase.

Because the FAA's policy for the use of credit hours and compensatory time was to exchange them hour-for-hour, the court declines to adopt defendant's method of computation. If a controller was earning $30 per hour at the time he earned an hour, and later used the hour when he was making $36 per hour, only one hour was charged to the controller's bank of time. The FAA did not, as defendant's argument suggests, subtract one hour and twelve minutes from the controller's bank to reflect the additional $6 in salary that the controller was earning when he used the hour. Under the FAA's policy, the use of credit hours and compensatory time did not take into account plaintiffs' regular rate of pay.[22] For that reason, defendant is not entitled to an offset to reflect any difference in plaintiffs' pay between the time they earned and the time they used their credit hours or compensatory time. Defendant's argument penalizes plaintiffs with no justification. Plaintiffs should not be penalized for choosing to use their hours at a later date when they may have been earning a higher hourly wage. The adoption of defendant's proposed method of calculation would decrease plaintiffs' FLSA back pay damages and would permit the United States to benefit from its failure to comply with the law.

e. Whether the Regular Rate Calculation Should Include Codes for Leave Without Pay and Follow OPM's Guidance

Defendant raised several additional arguments regarding Dr. Lanier's calculations, in

---

**22.** *D'Camera* also appears to contemplate the use of a plaintiff's regular rate at the time that an hour was earned to calculate back pay damages. *See D'Camera v. District of Columbia,* 722 F.Supp. 799, 803 (D.D.C.1989); Pls.' Br. 38–39. The *D'Camera* court stated that in order to deter-

mine the "monetary value of all overtime worked," a court should multiply the total number of overtime hours that plaintiff worked during the statutory period by "one and a half times the plaintiff's *then hourly wage.*" *D'Camera,* 722 F.Supp. at 803 (emphasis added).

particular, that the formula included codes for leave without pay as part of the total of hours worked, and, more generally, that the formula does not comply with OPM guidelines for calculating an employee's regular rate of pay. Def.'s Br. 21; *see also* PX 6 (Lanier Report) App. C; Tr. 592:8–12, 593:20–594:13 (Staley).

■ The court agrees with defendant's view that the formula should not include as "hours worked" hours which were coded as leave without pay. According to the overtime pay provisions of the Code of Federal Regulations, "hours of work" for the purpose of "determin[ing] an employee's entitlement to ... overtime pay," 5 C.F.R. § 551.401(d), include "[a]ll time spent by an employee performing an activity for the benefit of an agency and under the control or direction of the agency," *id.* § 551.401(a). "Hours in an unpaid nonwork status (e.g., leave without pay, furlough, absence without leave) are not 'hours of work' under [5 C.F.R. § 551.401]." *Id.* § 551.401(c). Because the Code of Federal Regulations explicitly excludes leave without pay from its definition of "hours of work" for the purpose of calculating overtime pay, it was improper for plaintiffs' expert to include hours coded as leave without pay in the total number of hours worked. In revising their calculations, plaintiffs shall ensure that the pay codes included in the formula as hours worked do not include codes for leave without pay hours.

Defendant contends that Dr. Lanier's formula does not follow OPM's guidance for calculation of the regular rate. Def.'s Br. 21, *see also* Tr. 592:8–12, 593:20–594:13 (Staley). As an initial matter, plaintiffs contend that defendant's argument is untimely because not raised before trial. Pls.' Br. 40–43, 45–46.

To support their timeliness argument, plaintiffs cite cases in which defendants' setoff defenses were held to be waived because not raised at the earliest possible stage of the proceedings. *Id.* at 41–42 (citing, inter alia, *Abramson,* 42 Fed.Cl. at 331; *Principal Life Ins. Co. v. United States* (*Principal Life* ), 76 Fed.Cl. 326, 326–28 (2007)). The question of whether plaintiffs' expert properly calculated the regular rate of pay in his computation of plaintiffs' damages is not a claim for setoff and does not raise the same timeliness concerns discussed in *Abramson* and *Principal Life.* The agreement of the parties at the pretrial conference stated that "[h]ow the back pay owed to plaintiffs should be calculated" was an issue to be determined at trial. *See* Order of Feb. 23, 2012, Dkt. No. 242, at 3. Defendant's introduction at trial of testimony that attempted to rebut Dr. Lanier's calculation of damages was not improper.

Although the court finds defendant's argument regarding the regular rate timely, the argument is unpersuasive. Mr. Staley testified that Dr. Lanier's formula "does not follow the rules that OPM prescribes for computing the FLSA regular rate in 5 CFR part 551." Tr. 592:1–12 (Staley). When asked how Dr. Lanier's formula deviates from OPM's guidance, Mr. Staley stated "I'm not exactly sure how," *id.* at 592:13–14, specifically identifying only a concern that the formula included pay codes for leave without pay hours as hours of work, *id.* at 593:23–594:13, 600:9–11, an argument the court addressed above. When asked on cross examination whether the formula used by Dr. Lanier resulted in "double count[ing]," Mr. Staley responded, "I'm not saying he overcounted, I'm saying [the formula] does not follow the prescribed method of calculating overtime by [OPM] in the regulation 5 CFR part 551." *Id.* at 601:6–11. Plaintiffs respond that Dr. Lanier's regular rate calculations and those prescribed by OPM both yield the same result. *See* Pls.' Br. 45–46.

Mr. Staley's testimony that Dr. Lanier's formula does not reflect exactly the formula used by OPM to calculate the regular rate of pay, and defendant's argument that this discrepancy renders Dr. Lanier's calculations "incorrect," *see* Def.'s Br. 21, are insufficient to persuade the court to disregard Dr. Lanier's calculations. Simply stating that Dr. Lanier's formula was not identical to OPM's formula—without any indication that the formula used by Dr. Lanier would yield an incorrect result or a result different from what would be generated using OPM's formula—is unpersuasive. The court finds that Dr. Lanier's formula is acceptable, *see supra*

Part III.A.3, subject to the exceptions set out in this Opinion.

### B. Plaintiffs Are Entitled to Liquidated Damages Because Defendant Failed to Establish Good Faith and Reasonable Grounds

Under 29 U.S.C. § 216(b), the court is directed to presume that plaintiffs are entitled to liquidated damages. *See* 28 U.S.C. § 216(b). In order to avoid the imposition of liquidated damages, the government bears a substantial burden to show that its decision was made in good faith and that it had reasonable grounds for its decision. *See Bull I*, 68 Fed.Cl. at 229 (quoting *Laffey*, 567 F.2d at 464–65); *Adams*, 350 F.3d at 1226. To establish good faith, defendant must show that it had, subjectively, " 'an honest intention to ascertain what the [FLSA] requires and to act in accordance with it.' " *Beebe*, 226 Ct.Cl. at 328, 640 F.2d at 1295 (quoting *Addison*, 204 F.2d at 93). In establishing objective, reasonable grounds for its decision, "[p]roof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act." *Id.*

Plaintiffs argue that the government did not act in good faith. In particular, plaintiffs point to the fact that Mr. Whitlow "concluded ... without any written analysis, that the FAA could select the portions of title 5 that it wished to implement" when he was designing the FAA's PMS Document. Pls.' Br. 25. Plaintiffs also argue that the FAA's failure to evaluate its liability under the FLSA at five "trigger" points also renders liquidated damages appropriate. In particular, plaintiffs argue that a reasonable employer would have taken steps to ascertain its FLSA liability: (1) in 1996 when Congress legislated that Title 5 no longer applied to the FAA; (2) in 1998 when the FAA and NATCA agreed that controllers could earn unlimited numbers of credit hours that would have no cash value; (3) in 2006 when the FAA expressed concern about being sued by controllers who had accumulated large amounts of credit hours; (4) in 2008 after the court issued its decision in *Abbey I*, 82 Fed.Cl. 722; and (5) at any time between 1996 and 2008 after the FAA adopted its unique new PMS system. *Id.* at 26–27. Plaintiffs also argue that it is significant that no one at the FAA consulted with DOL or OPM to determine their views about how the 1996 legislation might affect the FAA's FLSA obligations to controllers. *Id.* at 29.

Defendant responds that Mr. Whitlow "engaged in a serious, careful, and good faith effort to ascertain the FAA's authority" in drafting the PMS Document. Def.'s Br. 25. Defendant also contends that the fact that the PMS Document was "reviewed by high level officials with the FAA and DOT, union leaders, Congressional staffers, and Congress itself, which cited to the FAA PMS in subsequent legislation" demonstrates that the FAA also engaged in a good faith effort to ascertain whether there was any disagreement with the conclusions first reached by Mr. Whitlow. *Id.* at 25–26. According to defendant, after Mr. Whitlow's initial determination, there was no reason for the FAA to revisit the conclusion that it had the authority to adopt some provisions of Title 5, and by extension, provide compensatory time and credit hours. *Id.* at 27–28. With respect to the argument that the FAA should have consulted with OPM or DOL, defendant argues that there is no "reason why the FAA should have concluded that either OPM or DOL was better qualified than was the FAA, itself, to interpret the FAA personnel reform legislation contained in the Appropriations Act and the grant of authority to the FAA." *Id.* at 28.

With respect to whether the FAA had reasonable grounds for its decisions, defendant points to another decision of this court in which the court determined that the FAA had "extensive flexibility in choosing what, if anything, to incorporate from Title 5 in its personnel management system," including "authority to adopt the portion of Title 5 that enabled the use of credit hours to compensate those employees who worked on a flexible schedule." *Whalen v. United States*, 93 Fed.Cl. 579, 596–97 (2010); *see* Def.'s Br. 30. According to defendant, the fact that another judge came to a different conclusion regarding the legality of the FAA's provision of compensatory time and credit hours shows that the law is uncertain, ambiguous or com-

plex. Def.'s Br. 30. Moreover, defendant argues that the Appropriations Act was ambiguous and complex, with respect to both the date by which the FAA was required to implement its new personnel system, *id.*, and the fact that Congress "expressly preserved the application of some title 5 provisions, but neglected to mention others" that Mr. Whitlow thought that Congress must have intended to continue to apply to the FAA, such as the Privacy Act and FOIA, *id.* at 31 (citing Tr. 441:16–20 (Whitlow)).

Mr. Whitlow testified that he considered generally the interaction between the Appropriations Act, Title 5, and the FLSA as he was drafting the PMS Document. Tr. 437:2–439:7, 476:4–10 (Whitlow). Mr. Whitlow's general consideration during the development of the FAA's new personnel system, however, was not sufficient to establish good faith and reasonable grounds for the FAA's decision that it had the authority to continue in force certain personnel policies, including the provision of compensatory time and credit hours. *See* DX 2 (PMS Document) 2.47–2.48 (stating that "FAA employees shall continue to be eligible to work flexible and compressed work schedules under the same criteria, procedures, and limitations that were applicable on March 31, 1996" and that "the personnel compensation and benefits of all FAA employees shall continue to be determined in accordance with the standards and procedures that were in effect on March 31, 1996"). Mr. Whitlow did not articulate and record a legal rationale for his conclusion that the FAA could pick and choose which portions of Title 5 would continue to apply. Indeed, Mr. Whitlow admitted that he did not specifically consider the FAA's authority to provide compensatory time and credit hours, other than to list the provision of compensatory time by the FAA among subjects for further study. *See* Tr. 475:22–477:3 (Whitlow); DX 2 (PMS Document) 2.48–2.49 (directing that, "[i]n drafting the Compensation Revision Plan, the Associate Administrator for Administration shall address" particular initiatives and concepts, including the "FLSA status of all FAA employees" and the "use of compensatory time rather than overtime"). Moreover, the record indicates that

such further study was never undertaken. *See* Tr. 108:22–109:23 (Whitlow).

Defendant argues that there was no need for Mr. Whitlow individually to consider the FAA's authority to adopt compensatory time and credit hour provisions of Title 5 because such a determination was subsumed within his larger determination that the FAA could adopt any portion of Title 5 it deemed appropriate. *See* Def.'s Br. 26. Defendant's reliance on general "principles of logic," *see id.*, for this proposition is insufficient to persuade the court that a general determination that the FAA had authority to adopt any Title 5 provision it wished was sufficient to meet defendant's obligation to ensure that its personnel management system complied with the FLSA.

In the circumstances, Mr. Whitlow's determination that the FAA had the authority to continue in force certain personnel policies, including the provision of compensatory time and credit hours, was made at a level of generality and with such informality that the determination could not have been based on reasonable grounds and made in good faith. The absence of an articulated legal analysis is simply inconsistent with the establishment of an entirely new personnel management system for a federal agency.

A showing of good faith on the government's part requires the government to engage in "active steps to ascertain the dictates of the FLSA and then act to comply with them." *Angelo v. United States*, 57 Fed.Cl. 100, 105 (2003) (citing *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 142 (2d Cir.1999)). The general determination that the FLSA would continue to apply to FAA employees, Tr. 87:20–24 (Whitlow), without specific consideration of whether the FAA could continue to provide compensatory time and credit hours consistent with the FLSA, *id.* at 475:25–477:3, despite the fact that Title 5 would no longer apply to the FAA, is not sufficient to satisfy the requirement that the government take "active steps" to determine what the FLSA requires. *D'Camera*, 722 F.Supp. at 801 (finding that the employer's determination that sergeants were FLSA exempt was not in good faith where "[t]he District, apparently deeming its position as being self-evi-

dent, ... neglected to provide evidentiary support" for its determination (internal quotation marks omitted)). The court is aware that the FAA was under time pressure created by the Congressional deadline of April 1, 1996 and that there may have been little time to consider every detail of a new personnel policy. However, at a time when the FAA was admittedly developing a legal position on the interaction between section 347 of the Appropriations Act, Title 5, and the FLSA, *see* Tr. 435:21–436:19, 438:8–10 (Whitlow), a reasonable government actor would, at the least, have prepared a written legal analysis to support its decision.

■ Moreover, an agency's duty to comply with the FLSA is ongoing. *Cf. Friedman v. S. Fl. Psychiatric Assocs., Inc.*, 139 Fed.Appx. 183, 186 (11th Cir.2005) (per curiam) (unpublished) ("Reading information 20 years ago regarding the FLSA does not provide an objectively reasonable basis for believing one's conduct comports with the FLSA."); *Adams*, 46 Fed.Cl. at 621 (noting that there is a "continuing obligation" to monitor the number of employees that an employee supervises in the context of determining whether an employee is FLSA exempt). Testimony at trial made clear that, although the FAA identified compensatory time in the PMS Document as an area for future study, no such study was undertaken. Tr. 108:22–109:23 (Whitlow). It is not enough, as the government suggests, *see* Def.'s Br. 26–27, for the FAA's counsel to develop a general legal position about the FAA's authority to adopt whichever portions of Title 5 it deems fit and then wait to see if anyone makes specific objections. The fact that no one specifically questioned the FAA's authority to continue to provide compensatory time and credit hours is not relevant to the FAA's affirmative duty to ensure its own compliance with the FLSA or to question its own authority to provide compensatory time and credit hours in light of section 347 of the Appropriations Act. *See Williams v. Tri–Cnty. Growers, Inc.*, 747 F.2d 121, 129 (3d Cir.1984) ("The fact that an employer has broken the law for a long time without complaints from employees does not demonstrate the requisite good faith required by the statute."), *abrogated in part on other grounds as*

*recognized by Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908 n. 11 (3d Cir.1991). The FAA's continuing failure to comply with the FLSA not only does not excuse the FAA, but rather further undermines the FAA's claim that it acted in good faith in ascertaining its FLSA obligations.

■ In addition, none of the circumstances under which courts have previously determined that an employer acted in good faith is present here. There is no evidence that Mr. Whitlow "consulted an array of personnel authorities to develop his understanding of the FLSA requirements," or "sought input from ... Human Resource[s] staff" regarding FLSA compliance. *Huggins v. United States*, No. 95–285 C, 2005 WL 6112625, at *20 (Fed.Cl. Aug. 16, 2005) (unpublished). In continuing its practice of providing compensatory time and credit hours following the adoption of section 347, there is no allegation that the FAA relied on a decision by the Comptroller General or an opinion or guidance provided by any other relevant government agency "issued in response to [its] request for guidance." *Abbott v. United States*, 41 Fed.Cl. 553, 569 (1998), *aff'd on other grounds*, 204 F.3d 1099 (Fed. Cir.2000). Even though Mr. Whitlow was, at the time, the FAA's legal counsel with respect to personnel matters, " 'the advice and opinion of an attorney as to the applicability of the provisions of the [FLSA] ... is not in and of itself sufficient to establish "good faith" of the employer.' " *Whelan Sec. Co. v. United States*, 7 Cl.Ct. 496, 501 (1985) (quoting *Gustafson v. Fred Wolferman, Inc.*, 73 F.Supp. 186, 197 (W.D.Mo.1947) (holding that an employer's reliance on legal advice was not sufficient to establish good faith under section 11 of the Portal–to–Portal Act of 1947), *vacated and remanded on other grounds*, 169 F.2d 759 (8th Cir.1948)).

With respect to reasonable grounds, "[p]roof that the law is uncertain, ambiguous or complex may provide reasonable grounds for an employer's belief that he is in conformity with the Act, even though his belief is erroneous." *Beebe*, 226 Ct.Cl. at 328, 640 F.2d at 1295. "But legal uncertainty, to assist the employer's defense, must pervade

and markedly influence the employer's belief; merely that the law is uncertain does not suffice." *Laffey*, 567 F.2d at 466; *see also Harris v. District of Columbia*, 749 F.Supp. 301, 303 (1990) (citing *Laffey* for the proposition that to assist an employer's defense, legal uncertainty must influence the employer's belief that he is in conformity with the FLSA). In this case, the fact that two judges of this court could come to differing conclusions sixteen years after the FAA made its determination is insufficient to persuade the court that the law at the time the FAA determined that it could continue to provide compensatory time and credit hours was uncertain, ambiguous or complex. Moreover, the testimony provided by Mr. Whitlow did not suggest that any uncertainty or ambiguity in section 347 "perva[sively] and markedly influence[d]" his decision that the FAA could continue to apply any provision of Title 5 that it wished. On the contrary, Mr. Whitlow testified that with his understanding of Congress's intent to give the FAA flexibility, and "with the language in [section 347] and with the fact that if it were too literally interpreted it just wouldn't make sense," Mr. Whitlow "concluded that yes, FAA should be able to ... incorporate other provisions of Title 5 affirmatively into [the] new personnel management system." Tr. 438:8–439:7 (Whitlow). Mr. Whitlow also testified that he did not have any concern about, nor did he consider, the FAA's authority to continue to follow certain sections of Title 5 that might implicate the FLSA. *Id.* at 444:12–19. If there was any ambiguity in section 347 or in its interactions with the FLSA and Title 5, that ambiguity did not appear to affect the FAA's determination that it could continue to apply whichever provisions of Title 5 it wished.

Because the court finds that the government has failed to meet its "substantial burden" to show good faith and reasonable grounds, plaintiffs are entitled to liquidated damages equal to the amount of their unpaid overtime compensation. The nature of the violation is such that, had the court concluded that the FAA in good faith acted to ascertain its compliance with the FLSA and had reasonable grounds for its decision, the court still declines—and in its discretion, would have declined—to waive the award of liquidated damages. *See* 29 U.S.C. § 260.

C. Plaintiffs Are Not Entitled to an Extension of the Statute of Limitations Because Plaintiffs Failed to Meet Their Burden to Establish a Willful Violation of the FLSA; Nor Are Plaintiffs Entitled to Equitable Tolling in the Absence of Evidence of Concealment

1. Willfulness

"The [FLSA] statute of limitations is an affirmative defense that acts to bar plaintiffs' claims for any period of time more than two years before the date plaintiffs first filed their consents with this court,"[23] unless plaintiffs can prove a willful violation, in which case the statute of limitations is three years. *Bull I*, 68 Fed.Cl. at 272. The court now considers whether plaintiffs have met their burden of proving defendant's willfulness in violating the FLSA such that a third year of damages is warranted.

Plaintiffs argue that "the FAA undertook an unjustifiably high risk of violating the FLSA when it determined that it could establish a pay system, without any investigation into its legality, in which controllers would routinely work overtime ... yet be paid in a form of payment, credit hours, that the FAA decided had no cash value." Pls.' Br. 35. Plaintiffs also argue that "the FAA took another unjustifiably high risk when it failed to undertake any legal analysis of its credit hours/compensatory pay plan." *Id.* Plaintiffs fault the FAA for failing "to identify a single study or written analysis it conducted as to whether the provisions of Title 5 with respect to compensatory time and credit hours would apply to FAA employees," and for "fail[ing] to seek guidance from either [OPM] or [DOL] as to the legality of the FAA's policy and practice of providing compensatory time and credit hours." Pls.'

---

**23.** Plaintiffs' expert calculated damages for each plaintiff, with each plaintiff's date of filing consent with the court serving as the cutoff date from which the two- or three-year limitations period is calculated for each plaintiff. *See* Tr. 234:13–21 (Lanier).

Mem. 11. Plaintiffs also claim that some controllers were required by the FAA to use compensatory time before they could use annual leave under certain circumstances, which plaintiffs claim is a violation of Title 5 and therefore also a demonstration that defendant's system of picking and choosing the provisions of Title 5 it wished to apply to the FAA was willful. *Id.* at 17–18.

Defendant argues that "for an employer to have knowingly or recklessly disregarded its FLSA obligations, its actions must tend toward 'intentional' or 'deliberate' conduct," which defendant argues is absent here. Def.'s Br. 32 (quoting *McLaughlin,* 486 U.S. at 133, 135 n. 5, 108 S.Ct. 1677). According to defendant, "Mr. Whitlow carefully analyzed the personnel reform legislation [ ]on behalf of the FAA before concluding that the FAA had authority to continue title five practices that implicated the FLSA," and therefore the FAA did not fail to engage in analysis before determining that it could continue to award compensatory time and credit hours. *Id.* Defendant also argues that the fact that the FAA was relying upon the advice of Mr. Whitlow, an attorney for the FAA, demonstrates that the violation was not willful. *Id.* at 33. Defendant argues that the FAA need not have contacted OPM or DOL to request guidance because "there was no reason for the FAA to believe that either OPM or DOL would have any special expertise in interpreting [the Appropriations Act]," and that plaintiffs have not shown that the FAA "grant[ed] credit hours that it knew plaintiffs would never be able to use ... allowing plaintiffs to work overtime for no pay at all." *Id.*

Plaintiffs bear the burden to show that defendant's conduct is willful. *Moreno,* 88 Fed.Cl. at 277. For plaintiffs to receive the benefit of the three-year statute of limitations, plaintiffs must show that "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin,* 486 U.S. at 133, 108 S.Ct. 1677; *see also Bull II,* 479 F.3d at 1379. According to the relevant regulations, "Reckless disregard of the requirements of the Act means failure to make adequate inquiry into whether conduct is in compliance with the Act." 5 C.F.R. § 551.104. However, a "failure to make adequate inquiry," if the regulation is to be read consistently with *McLaughlin,* must be more than a merely negligent or unreasonable failure. *See Angelo,* 57 Fed.Cl. at 109; *Moreno v. United States,* 82 Fed.Cl. 387, 396 n. 24 (2008); *Johnson v. Big Lots Stores, Inc.,* 604 F.Supp.2d 903, 924 (E.D.La.2009). If an employer "acts reasonably in determining its legal obligation, its action cannot be deemed willful"; willfulness means something more than "merely negligent" conduct. *McLaughlin,* 486 U.S. at 133, 135 n. 13, 108 S.Ct. 1677; *see also Reich v. Dep't of Conservation & Natural Res., State of Ala.,* 28 F.3d 1076, 1084 (11th Cir.1994).

> Courts have found willful violations of the FLSA where an employer disregards the DOL's Wage and Hour Division warnings, *Reich v. Bay, Inc.,* 23 F.3d 110 (5th Cir. 1994), ignores the advice of its own legal department, *Bankston,* 60 F.3d at 1254, or has been penalized previously for violating the FLSA. *Chao v. A–One Medical Services, Inc.,* 346 F.3d 908, 918–19 (9th Cir. 2003).

*Bull I,* 68 Fed.Cl. at 273. This court has also found a willful violation where the government knew that plaintiffs were laundering and processing towels and constructing training aids used to train drug-sniffing dogs for which they were not being compensated. *Id.* On the other hand, the United States Court of Appeals for the Federal Circuit (Federal Circuit) has held that where defendant relied in good faith on the advice of the secretary of labor, its violation of the FLSA was not willful. *Cook v. United States,* 855 F.2d 848, 850 (Fed.Cir.1988); *see also Abbott,* 41 Fed. Cl. at 569 (concluding that defendant's reliance on a Comptroller General decision negated a finding of a willful violation of the FLSA). The Federal Circuit has also affirmed a decision concluding that, where an employer had constructive but not actual knowledge that plaintiffs were cleaning their weapons off duty without being paid overtime compensation, the employer's conduct did not rise to the level of willfulness. *Bull I,* 68 Fed.Cl. at 274.

Plaintiffs do not argue that the FAA knew that its conduct violated the FLSA, nor did the record reflect any evidence of actual knowledge until the court's opinion, *Abbey I*, 82 Fed.Cl. 722, finding liability. This fact alone renders this case unlike the portion of *Bull I* in which the court concluded that Customs and Border Protection had actual knowledge that its employees were working overtime for no pay, *Bull I*, 68 Fed.Cl. at 273, and also unlike *Bankston* and *Reich*, where the employer was specifically notified (respectively, by counsel and by DOL) that its practices violated the FLSA, *Bankston*, 60 F.3d at 1254; *Reich*, 23 F.3d at 117.

■ Where no actual knowledge is alleged, plaintiffs must establish that the FAA recklessly disregarded the requirements of the FLSA. While defendant's conduct in determining that it could continue to provide credit hours and compensatory time although Title 5 no longer applied to the FAA can certainly be viewed as negligent and unreasonable, the court cannot find that such conduct rises to the level of willfulness as defined by the Supreme Court in *McLaughlin*.

After passage of the Appropriations Act in 1995, the FAA was required to make a judgment call in the face of a Congressionally-mandated shakeup of its personnel system: the Agency needed to decide, quickly (before Congress's April 1, 1996 deadline) how section 347, the FLSA and Title 5 would interact under the new system. *See* Tr. 435:7–436:19 (Whitlow); *id.* at 438:8–439:7. Mr. Whitlow, counsel for the Agency and an attorney with considerable experience in FAA personnel matters, *id.* at 428:2–8 (noting Mr. Whitlow's title of assistant chief counsel); *id.* at 421:9–424:8 (testifying that Mr. Whitlow began working for the FAA in 1976 and has experience in personnel matters), came to a legal conclusion based on his interpretation of the relevant statutes that permitted the FAA to maintain some continuity in its personnel practices during the transition to the new personnel system, *cf. Huggins*, 2005 WL 6112625, at *17 (noting that "good faith compliance with an opinion from an attorney may be affirmative evidence that the employer acted in compliance with the FLSA"). He concluded that some portions of Title 5

should continue to apply to the FAA, Tr. 438:25–439:7 (Whitlow), so that the Agency would continue to have the authority to expend certain funds, *id.* at 437:3–8, so that certain important legal regimes applicable to all government agencies (including FOIA and the Privacy Act) would continue to apply, *id.* at 99:16–20, and to allay the concerns of employees that the FAA would "run roughshod over its own employees" by declining to award back pay for employees who won administrative personnel cases, *id.* at 437:10–23.

The court concluded above in Part III.B that a reasonable agency likely would have prepared a written legal analysis to support this conclusion. It also would have been prudent for Mr. Whitlow to have examined specifically whether the FAA could continue under the FLSA its overtime practices of providing compensatory time and credit hours, rather than merely continuing the practice while placing the issue on a list for further study. A more cautious actor might also have sought the advice of OPM or DOL on the issue of whether the personnel management system planned in the draft PMS Document would be FLSA compliant. While these failures may rise to the level of negligence or unreasonableness, they do not amount to a willful violation of the FLSA. *Cf. Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 130, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (finding no willful violation of the Age Discrimination in Employment Act where it appeared that "the parties involved, in focusing on a larger overall problem, simply overlooked the challenged aspect of [a] new plan")

In the context of determining willfulness, it is relevant that defendant did not receive complaints from employees or the union regarding the provision of credit hours and compensatory time. *See Mallini v. Ala. Dep't of Indus. Relations*, No. 10–0130–CG–C, 2011 WL 1897646, at *9 (S.D.Ala. May 18, 2011) (finding no willful violation of the FLSA where defendant "had no notice of a potential violation until the mistake was brought to their attention"). Mr. Whitlow testified to the extensive review process that the PMS Document underwent. *See* Tr.

445:25–457:25 (Whitlow). As defendant points out, *see* Def.'s Br. 25–26, no one from the FAA objected to Mr. Whitlow's conclusion that the FAA could adopt certain portions of Title 5 or could continue many of its current policies in effect, Tr. 454:19–457:12 (Whitlow). Moreover, the union representatives involved in the PRAB, *see id.* at 431:8–14, and PMS Document review process, *id.* at 454:19–457:12, did not object. Indeed, during numerous collective bargaining negotiations, the union did not object to the provision of compensatory time and credit hours or argue that the FAA lacked the authority to provide them. *See* Tr. 161:4–7 (Krasner) ("Q And prior to this lawsuit, the union never challenged the granting of credit hours by the FAA as unlawful. Isn't that correct? A Not to my knowledge, no."); Tr. 323:22–24 (Masson) ("Q How many controllers questioned whether the FAA had the [ ]legal right to grant credit hours? A I'm not aware of any."). Instead, the CBAs show that the union actually wanted the cap on credit hours removed so that controllers could earn additional hours, despite the fact that those extra hours would have no cash value. *See* DX 1 (1998 MOU); *cf.* Tr. 160:25–161:3 (Krasner) ("[Y]ou would agree that the union made a proposal in connection with the 2006 negotiations to have unlimited credit hours? A Yes, that's correct."). This is not a situation where defendant was put on notice that it was in violation of the FLSA and failed to remedy the situation. Instead, the FAA made incorrect judgments that stood for years without complaint.

Plaintiffs argue that defendant was on notice that it was violating the FLSA once the court issued its opinion on liability in July 2008.[24] Pls.' Br. 8; Pls.' Mem. 12. Plaintiffs make much of the fact that defendant did not suspend the provision of compensatory time

and credit hours until October 1, 2009, more than a year after the court's decision, and argue that the court should find a willful violation based on this delay. Pls.' Br. 8; Pls.' Mem. 12.

Mr. Staley testified at trial that "there were numerous meetings and discussions" within the FAA after the court's decision and that the FAA "stopped allowing compensatory time and credit hours to be earned by our air traffic controllers at some point … between the decision and the 2009 contract." Tr. 581:5–22 (Staley). The FAA also needed to negotiate with the union about this issue because the CBA in force at the time of the court's decision still permitted controllers to earn compensatory time and credit hours. *See id.* at 624:19–20 (stating that the FAA was required to continue provisions of the previous collective bargaining agreement "until negotiations had occurred"); JX 2 (2006 CBA) 77–79, 84–85. Mr. Staley testified that "with the 2009 contract we made the agreement that we would not authorize … any compensatory time or credit hours … under the new agreement." Tr. 581:22–582:1 (Staley). Under these circumstances, where the Agency needed to revisit for the first time in many years its authority to provide compensatory time and credit hours, and where the Agency also needed to come to an agreement with its union about how to handle the issue, the court does not find unreasonable the lapse of a year between the court's decision and compliance with the terms of the decision. *See Angelo*, 57 Fed. Cl. at 109 n. 11 (finding that a ten-month delay between when the government first acknowledged its liability to pay overtime and the time when it began paying overtime did not establish a willful violation). Accordingly, the FAA's delay in responding to the

---

**24.** Plaintiffs also argue that defendant was on notice of a potential FLSA violation as early as 1998 when the FAA and NATCA agreed to lift the twenty-four hour cap on credit hours, Pls.' Br. 6–7, or perhaps in 2006 during collective bargaining negotiations, *id.* at 8. Mr. Krasner testified that the FAA's chief negotiator, Rick DuCharme, expressed concern during the 2006 negotiations that controllers who had built up very large balances of credit hours might, upon retirement, sue the FAA when they were unable to receive cash payment for unused credit hours. Tr.

152:23–153:13 (Krasner). However, concern about the large banks of credit hours that some controllers might earn after the twenty-four hour cap was lifted in 1998, or concern over the large credit hour banks that some controllers did accrue after the cap was lifted, is not the same as questioning the FAA's authority to provide compensatory time and credit hours at all. Mr. Krasner's testimony regarding Mr. DuCharme's concern over potential lawsuits does not require the conclusion that defendant was then on notice that it was violating the FLSA.

court's 2008 decision does not establish defendant's willfulness.[25]

Moreover, this is not a situation in which controllers were regularly working overtime for free. Controllers received payment in the form of hour-for-hour leave time for the overtime work that they performed, and the testimony at trial demonstrated that most controllers were able to use those hours as they would use their annual leave. *See* Tr. 135:17–136:13 (Masson); Tr. 499:7–500:4 (Jensen); Tr. 56:9–60:8, 555:17–25, 557:5–10 (Staley); Tr. 131:2–18 (Masson). Plaintiffs attempted to show that defendant's actions were willful because, under the flexible work system set up by the FAA, controllers could in some circumstances amass a large bank of credit hours that had no cash value and that might not be available for use by the controller in case of separation or retirement, resulting, as plaintiffs put it, in free work for the Agency. Pls.' Br. 13, 35. Testimony at trial, however, reflected that, although some controllers amassed large banks of hours, the average controller did not, *see* Tr. 366:7–12 (Masson), and no witness was aware of any controller who was unable to use his hours before separation or retirement, *see. e.g., id.* at 368:14–16 ("I'm not aware of anyone that was not allowed to take their credit hours

prior to voluntary separation."); *id.* at 319:20–25 ("I would say that voluntarily leaving the FAA that people used their credit hours up. They had ample time to plan and to use their credit hours[;] even people that had accumulated hundreds of hours had the opportunity to burn it off prior to leaving the agency."); Tr. 202:9–13 (LeBovidge) ("Q In fact, you're not aware of a single employee who had unused credit hours when he or she left the FAA? A "I am not aware of anybody who had unused credit hours.").[26]

Under these circumstances, the court does not find deliberate action on the part of the agency to induce controllers to work for free. Instead, the fact that the controllers could potentially amass more credit hours than they could reasonably use before separation from the Agency was the unfortunate product of the agreement between the FAA and the controller's union that created a possibility of working overtime without pay, but nonetheless resulted in little to no practical harm to controllers. The mere possibility under the FAA's credit hour system that employees could earn hours and not be compensated is insufficient to show a willful violation of the FLSA. *Cf. Johnson*, 604 F.Supp.2d at 925 (finding no willful violation of the FLSA in part because there was "no

---

**25.** Plaintiffs also argue that because the relevant collective bargaining agreement in force at the time of the court's 2008 decision contained a "reopener clause to amend the agreement if there is a change in the law," defendant cannot "justify its inaction in response to the Court's decision in 2008." Pls.' Post Trial Reply Br., Dkt. No. 270, at 9 n. 7. Plaintiffs can provide no guarantee, however, that, even if the reopener clause had been invoked, the resulting negotiations regarding that provision would have concluded any sooner than the negotiations of the actual new collective bargaining agreement. Moreover, the "reopener clause" on its face appears to apply in the face of legislative enactments or modification of the provisions or regulations of the Federal Labor Relations Authority and does not explicitly contemplate reopener in the wake of a court decision. *See* JX 2 (2006 CBA) 172 ("In the event legislation is enacted which affects any provisions of this Agreement, the Parties shall reopen the affected provision(s) and renegotiate its contents . . . Any modification of the provisions or regulations of the Federal Labor Relations Authority affecting a provision of this Agreement or the relationship of the Parties may serve as a basis for the reopening of the affected provision(s).").

**26.** At trial, plaintiffs' counsel attempted to elicit testimony from Mr. Lawrence Markel, an air traffic control specialist with the FAA before his retirement two years ago, that attempted to show that Mr. Markel had unused credit hours on the books when he retired and did not receive compensation for those hours. *See* Tr. 212:5–213:9 (Markel). Defendant's counsel objected to the testimony on the grounds that Mr. Markel's testimony was to be restricted to compensatory time according to plaintiffs' witness list. *See* Tr. 212:8–10 (defendant's counsel). The court indicated that it intended to disregard the testimony because, although plaintiffs' counsel argued that the testimony would be appropriate as rebuttal, the court disagreed. *See* Tr. 213:11–214:8 (colloquy between counsel and the court). Even if the testimony was admissible, the fact that one controller out of approximately 48,000 FAA employees, *see* Tr. 582:14–17 (Staley), and 15,000 air traffic controllers, *see* Tr. 515:17–19 (Jensen), was unable to use all of his credit hours prior to separation is insufficient to establish a willful violation of the FLSA.

evidence suggesting an overarching corporate policy" to deny assistant managers managerial responsibilities in an effort to avoid paying FLSA-mandated overtime).

Plaintiffs' argument that the FAA's actions were willful because in some cases controllers were required, under FAA policy, to use compensatory time before annual leave lacks merit. Testimony at trial demonstrated that the FAA's policy was that, unless an employee was in use-or-lose status with respect to annual leave (that is, unless an employee needed to use her annual leave because it was about to expire, see Tr. 209:12–22 (Markel)), the employee could be required by the FAA to use compensatory time before annual leave, see Tr. 569:13–570:17 (Staley); Tr. 138:2–14 (Masson). When an employee was not in use-or-lose status and requested leave, the FAA would not approve a request for annual leave until the employee's bank of compensatory time was depleted. See Tr. 569:13–570:17 (Staley). Testimony at trial demonstrated that some employees were required to use compensatory time before annual leave even when in a use-or-lose situation. See Tr. 189:20–190:7 (LeBovidge) ("[A]t the end of his career, he attempted to take some leave, annual leave, and the agency deducted his compensatory time balance. He had not requested to utilize his compensatory time. It was forced from his bank."); Tr. 210:10–211:7 (Markel). Testimony also demonstrated that the FAA's policy of requiring the use of compensatory time prior to annual leave was the subject of a NATCA grievance and an arbitration,[27] which was resolved in the union's favor. Tr. 512:6–15 (Jensen). One hundred employees were on the initial list to have their compensatory time banks restored as a result of the arbitration, but only twelve actually had their compensatory time restored. Id. at 512:16–515:16. For the other eighty-eight controllers, the FAA determined that restoring their compensatory time banks and deducting from annual leave would not benefit the

controllers because the compensatory time was stored at rate lower than the rate at which the controllers' annual leave was paid out. Id. at 514:16–515:16.

As far as the court can discern, plaintiffs do not argue in this suit that the FAA's policy of requiring controllers to use compensatory time before annual leave was an independent FLSA violation. Instead, plaintiffs argue that, because this policy may have harmed financially some controllers, it compounds defendant's established FLSA violation to the point of willfulness. The court does not find that this policy, which adversely affected only twelve of the FAA's 15,000 controllers, see id. at 515:17–19, is relevant to the question of defendant's willfulness with respect to its determination that it could provide compensatory time and credit hours. Moreover, any question regarding the legality of this policy was apparently considered and resolved in an arbitration, and the court declines to reconsider it here.

For the foregoing reasons, plaintiffs have failed to meet their burden to establish a willful violation of the FLSA. Therefore, plaintiffs are not entitled to extension of the FLSA statute of limitations to provide a third year of damages unless they can otherwise establish such entitlement.

2. Equitable Tolling

Plaintiffs also argue that they are entitled to damages for all hours, including hours earned and used prior to the statutory recovery period, under a theory of equitable tolling. Pls.' Mem. 37. Plaintiffs argue that "the FAA misled the employees into working vast amounts of time it now contends [are] essentially worthless," and that "the FAA coerced employees into using banked compensatory time ... by requiring that they use this time prior to using annual leave." Id. For the foregoing reasons, plaintiffs contend that equitable tolling is appropriate and that the court should, as in proposed Scenario Two, permit plaintiffs to recover for all compensa-

---

**27.** Defendant states that "[t]he issue litigated [in the arbitration] was not the FAA's policy of requiring controllers to use compensatory time before annual leave but, rather, the FAA's *enforcement* of that policy without negotiation with the union after many years of non-enforcement."

Def.'s Reply to Pls.' Post–Trial Br., Dkt. No. 271, at 6–7. Because the court finds that the arbitration and related FAA policy are not relevant to the issue of willfulness, the court need not resolve this discrepancy in the parties' descriptions of the arbitration.

tory and credit hours no matter when earned. *Id.*

Defendant responds that the overtime hours for which plaintiffs are to be compensated under the statute must exclude all hours earned before the statutory recovery period. Def.'s Mem. 42–43; *see also* Def.'s Br. 36. Defendant argues that equitable tolling of the FLSA statute is not appropriate because the statute of limitations is set forth in the text of the statute, the statute of limitations is stated in an "unusually emphatic form" and the statute of limitations already includes explicit exceptions, and therefore "all three of the[ ] factors militating against equitable tolling are present in this case." Def.'s Mem. 43–44.

■ Equitable tolling of the statute of limitations in an FLSA case may be appropriate where plaintiff can show: (1) "that there was a defective pleading filed during the statutory period," or (2) that "the plaintiff has been induced or tricked by the defendant's misconduct into allowing the filing deadline to pass." *Christofferson,* 64 Fed.Cl. at 326; *see also Hickman,* 43 Fed.Cl. at 427; *Irwin,* 498 U.S. at 96, 111 S.Ct. 453. Plaintiffs do not allege that they are entitled to equitable tolling on the basis that they filed a defective pleading. Instead, plaintiffs appear to argue that the FAA concealed its conduct or misled its employees by permitting them to bank credit hours that would have no cash value and by requiring employees, in certain circumstances, to use banked compensatory time before using annual leave. *See* Pls.' Mem. 37.

■ Plaintiffs' factual allegations are insufficient to establish their entitlement to equitable tolling. Whether the FAA's policy was that credit hours would have no cash value or that employees must use compensatory time before using annual leave has no bearing on whether plaintiffs knew or had reason to know that they had an FLSA cause of action. These FAA policies are not the type of "concealment or secretive conduct which [would have] prevented plaintiffs from becoming aware of the alleged injury." *See Christofferson,* 64 Fed.Cl. at 327. Where plaintiffs were receiving paychecks that did not properly compensate them for overtime

hours worked in accordance with the FLSA, and where plaintiffs clearly knew the FAA's policies with respect to credit hours and compensatory time because they were negotiated as part of collective bargaining agreements as early as 1996, *see* DX 28 (May 1996 MOA) 28.2, plaintiffs cannot establish that they were not on notice of their potential overtime claims under the FLSA, *see Nerseth v. United States,* 17 Cl.Ct. 660, 665 (1989) (holding that plaintiffs in an FLSA case were not entitled to equitable tolling where plaintiffs received paychecks that did not contain the overtime compensation required by law); *Christofferson,* 64 Fed.Cl. at 327 (holding that, where plaintiffs were working overtime and knew they would not be paid for it, plaintiffs were not entitled to equitable tolling, in part because the government was under no duty to give plaintiffs notice of potential claims); *Huggins,* 2005 WL 6112625, at *8–9 (holding that plaintiffs were not entitled to equitable tolling of the FLSA statute of limitations where plaintiffs knew that they had been classified as FLSA exempt although the government asserted that plaintiffs were properly classified). Plaintiffs are not entitled to damages for compensatory time and credit hours earned prior to the two-year statutory recovery period.

## IV. Conclusion

For the foregoing reasons, the court finds that plaintiffs are entitled to compensation under the FLSA for credit hours earned during the statutory period and not used at the rate of 1.5 times the plaintiff's regular rate of pay at the time the credit hour was earned. Plaintiffs are also entitled to compensation in the amount of 0.5 times the plaintiff's regular rate of pay at the time an hour was earned for all compensatory time and credit hours earned and used during the statutory period.

Because defendant failed to meet its burden to show that it acted in good faith, plaintiffs are also entitled to statutory liquidated damages under the FLSA in the same amount as their unpaid overtime compensation. *See* 29 U.S.C. § 216(b).

Because plaintiffs failed to meet their burden to show that defendant acted willfully

within the meaning of the FLSA, plaintiffs are entitled to two, not to three, years of back pay. *See* 29 U.S.C. § 255(a).

Plaintiffs shall also recover from defendant "a reasonable attorney's fee ... and costs of the action." 29 U.S.C. § 216(b). The court will consider timely and complete applications for recovery of attorney's fees and costs under Rule 54(d) of the Rules of the United States Court of Federal Claims.

The parties shall, on or before Wednesday, July 11, 2012, jointly calculate and present to the court the amount of compensation to which each representative plaintiff is entitled in accordance with this Opinion. If for any reason the parties do not agree on any part of such calculations, the parties shall, on or before Wednesday, July 25, 2012, also present to the court such calculations as to which they do not agree accompanied, with respect to each such disagreement, by specific and complete statements explaining their respective positions and the bases therefor.

IT IS SO ORDERED.

*APPENDIX A*

I.   Background ............................................................257
     A.   Procedural Background ...........................................257
     B.   Factual Findings ................................................259
          1.   Development of the FAA's Personnel Management System (PMS).....259
          2.   Accrual and Use of Credit Hours and Compensatory Time .............261
               a.   Credit Hours ...........................................261
               b.   Compensatory Time ........................................263

II.  Legal Standards ......................................................264
     A.   Calculation of Back Pay .........................................264
     B.   Liquidated Damages and Standard for Good Faith .......................264
     C.   FLSA Statute of Limitations and Standard for Willful Violations ...........265
     D.   Equitable Tolling ...............................................266
     E.   Attorneys' Fees and Costs .......................................266

III. Discussion ...........................................................267
     A.   Calculation of Damages for Back Pay ..............................267
          1.   Plaintiffs' Proposed Calculations: Three Scenarios ....................267
          2.   Defendant's Proposed Changes to Plaintiffs' Calculations ..............269
          3.   Decision With Respect to Calculation of Damages .....................272
               a.   Because, as Set Forth in Scenario One, the Government Is
                    Entitled to an Offset for Compensatory Time and Credit Hours
                    Earned and Used, Calculation of Back Pay Under Scenario Three
                    Would Be Inappropriate .........................................272
               b.   Plaintiffs Are Not Entitled to Scenario Two Damages for Pre–
                    Statutory Period Hours .........................................273
               c.   Use of the FIFO Method Is, in General, Appropriate, and Does
                    Not Result in the Award of Damages for Pre–Statutory Period
                    Hours ..........................................................273
               d.   The Proper Calculation of Damages Values a Compensatory or
                    Credit Hour at the Controller's Regular Rate at the Time the
                    Hour Was Earned ................................................276
               e.   Whether the Regular Rate Calculation Should Include Codes for
                    Leave Without Pay and Follow OPM's Guidance ....................276
     B.   Plaintiffs Are Entitled to Liquidated Damages Because Defendant
          Failed to Establish Good Faith and Reasonable Grounds ................278
     C.   Plaintiffs Are Not Entitled to an Extension of the Statute of Limitations
          Because Plaintiffs Failed to Meet Their Burden to Establish a Willful
          Violation of the FLSA; Nor Are Plaintiffs Entitled to Equitable
          Tolling in the Absence of Evidence of Concealment ....................281
          1.   Willfulness ...............................................281
          2.   Equitable Tolling .........................................286

289

IV. Conclusion ............................................................287